UNITED STATES of America

v.

Omar Sharif MCKOY

No. CR. 03–10178–DPW.

United States District Court,
D. Massachusetts.

Dec. 9, 2004.

Owen S. Walker, Federal Defender's Office, Boston, MA, for Defendant.

Robert E. Richardson, United States Attorney's Office, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Defendant Omar Sharif McKoy, accused of possession with intent to distribute cocaine base and possession of cocaine base with intent to distribute within 1,000 feet of a school in violation of §§ 841(a)(1) and 860(a), moves to suppress drugs seized by the police during an encounter with police on February 6, 2003. I find that the pat frisk search of McKoy conducted during an investigatory stop for a traffic violation was not supported by reasonable suspicion that he posed a threat to the officers' safety. I will therefore allow the motion to suppress.

## I. FINDINGS OF FACT

Having afforded the parties a full opportunity to develop the record in this matter, I find the following. On the afternoon of February 6, 2003, Boston Police Sergeant Michael Stratton and Officer Thomas Joyce were patrolling the Grove Hall neighborhood in Boston in plainclothes driving an unmarked Ford. They believed the neighborhood to be a high-crime area. At shortly after 4:00 P.M., Stratton and Joyce were driving down Cheney Street approaching Maple Street. They slowed their vehicle as they approached Maple to watch for traffic and to survey the area. When they came upon the intersection of Cheney and Maple, Stratton brought the car to a stop after seeing the defendant's vehicle parked with its front extending out into the intersection blocking a handicapped ramp and with a license plate improperly displayed inside the windshield.

Stratton testified that Mr. McKoy "appeared startled" and "began to look from side to side, not looking back in our direction" after the two made eye contact. Joyce recounted the moment by testifying that he saw "a black male sitting in the driver's seat. When he made eye contact with us, he looked away, began to act a little nervous, in my opinion, and we decided to investigate further." Stratton also recalled that McKoy leaned and moved his arm toward the console area when eye contact was made.

The two officers left their vehicle and approached Mr. McKoy.[1] Upon approaching the vehicle, Sergeant Stratton saw the defendant once again move his arm. Although he was not entirely certain what McKoy was doing, Stratton testified that it looked like the defendant was putting something down. Joyce also saw the defendant move at this stage. In response to this movement, Stratton said to Joyce " '[W]hat's he doing [?][H]e's doing something,' or words to that effect." Joyce—who, according to his testimony, was afraid for his safety—requested that the defen-

---

1. It is not entirely clear from the record whether or when McKoy became aware that Stratton and Joyce were police officers. Following the hearing in this matter, Stratton submitted a supplemental affidavit asserting that he wears his badge on his belt and, although he cannot remember exactly where Joyce wore his badge on that day, is sure that it was visible. The affidavit also mentions other indications that the two were police officers. There is no indication that the defendant questioned in any way the authority of Joyce to remove him from the car. Therefore, I find that the defendant knew he was dealing with police officers—if not when they were in their car—at least at the point when they were approaching his car on foot. Yet, as this memorandum will detail, even if I assume he knew they were police officers the moment he first saw them, the frisk would not be reasonable under the facts in this case. And, to the extent McKoy did not know the two men were police officers, the frisk becomes even less justifiable, because the nervousness and movements witnessed could not be interpreted as reactions to a police presence.

dant get out of the car [2] and began to pat-frisk him. Not feeling any weapons in his waist area, Joyce moved to McKoy's pockets where he felt something that he believed to be a bag of marijuana. His interest piqued, Joyce—using street slang for a small bag of marijuana—asked "what do you have, a sack on you?", or something to that effect, to which Mr. McKoy replied affirmatively and was placed under arrest. A search of the car produced no further evidence. A search of McKoy's person resulted in the police seizing 5.63 grams of cocaine.

## II. DISCUSSION

■ The Fourth Amendment protects "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures....," U.S. Const. amend. IV, and "[t]he question of whether an officer has reasonable grounds to 'stop' and 'frisk' falls directly within the Fourth Amendment's proscription against unreasonable searches and seizures." *United States v. Walker*, 924 F.2d 1, 3 (1st Cir.1991) (citing

*Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Nevertheless, police officers are permitted to conduct stops based on reasonable suspicion that criminal activity is afoot [3] and to frisk the detained citizen if they have a reasonable belief the person is armed. *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. "[W]here nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Id.*

This is not to say that officers are entitled to frisk anyone they briefly detain. To have an adequate foundation for such limited searches, the officer "must have constitutionally adequate, reasonable grounds for doing so." *Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). "[The officer] must be able to point to particular facts from which he reasonably inferred that the indi-

**2.** It is not entirely clear from the face of Joyce's testimony when the defendant made his last movement in relation to when he was asked to leave his vehicle. One portion of Joyce's testimony seems to state that McKoy leaned forward after Joyce had requested he leave the car:

As we get to the car, again, when we asked the person, Mr. McKoy, to step out of the car, he again reached forward. And we couldn't see what he was doing. I wanted him out of the car as quick as possible, because, yes, I was in fear for my safety at that time.

Examining the encounter in context, however, in light of the testimony of Stratton, I find that the second movement was witnessed as the officers approached, before McKoy was asked to leave the car, and that promptly upon being asked, McKoy left his vehicle.

**3.** Of course, the police did not actually stop the car in this case. At the point when they

asked McKoy to leave the car, however, they had seized him for purposes of the Fourth Amendment.

The police officers in this case were justified in stopping the defendant and effecting this initial seizure because they had probable cause to believe he had committed two separate traffic violations. *See Whren v. U.S.*, 517 U.S. 806, 819, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that probable cause to believe the traffic code had been violated "rendered *the stop reasonable under the Fourth Amendment*" regardless of officers' subjective intent). The officers in this case were also permitted to ask Mr. McKoy to get out of the car. *See Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) ("[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop."). The remainder of this memorandum and order, therefore, will focus on whether the officers were justified in frisking Mr. McKoy once he left the car.

vidual was armed and dangerous." *Id.* When assessing these particular facts, courts are to consider the totality of the circumstances, *see United States v. Gilliard,* 847 F.2d 21, 24 (1st Cir.1988), recognizing "that roadside encounters between police and suspects are especially hazardous." *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

It also must be kept in mind that because the police, regardless of their subjective intent for doing so, may stop anyone who has committed a traffic violation, *see Whren v. U.S.,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), there is, as a practical matter, great potential for significant intrusions on a citizen's freedom of movement. To mitigate that potential, the justification for stopping and asking a citizen to get out of his vehicle does not ineluctably satisfy the further requirements for frisking him. Before turning to the specifics of this case, it may be useful to discuss the tensions embedded in this area of law.

As already noted, the Fourth Amendment permits officers to detain an individual briefly on reasonable suspicion of criminal activity and to frisk him for weapons whenever there is an objectively reasonable belief that the subject is armed and dangerous.[4] This principle can be applied in a strained manner, because—consider-

ing the magnitude of the consequences of any one motorist drawing a firearm on a police officer—it is arguably objectively reasonable for an officer approaching virtually any strange person in a vehicle always to feel in danger. *See United States v. Thomas,* 863 F.2d 622, 629 (9th Cir. 1988) (reciting testimony—in a case where the court found insufficient justification for the frisk—where in response to the question "why did you pat [the defendant] down?" the officer responded: "Basically for my own safety. I was by myself. I was investigating a felony. There were two of them, one of me. I didn't want any surprises. So I patted down just about everything under that kind of circumstance.") That, of course, does not define the formal boundaries of the Fourth Amendment protections here, but it is crucial to recognize that it informs how they are applied by courts.

Courts have developed factors, and have called for the police to identify articulable facts, warranting frisks in an attempt to place real limits on police conduct during investigatory stops. But these boundaries have been subjected to constant pressure in the case law. This should come as no surprise considering the posture in which most of these cases appear before judges. Searches that result in no weapons or contraband being found do not—as a practical matter—make it to the courthouse door.

---

4. The *Terry* doctrine is designed as an amelioration of the rigors of traditional Fourth Amendment rules. The doctrine attempts to provide police officers with greater flexibility while also creating enforceable limits in the face of practical realities making such enforcement quite difficult. Some believe that the very concept of frisking a suspect on mere suspicion has insufficient constitutional footing. For instance, Justice Scalia has observed that he is

> unaware ... of any precedent for a physical search of a person thus temporarily detained for questioning. Sometimes, of

course, the temporary detention of a suspicious character would be elevated to a full custodial arrest on probable cause.... At *that* point, it is clear that the common law would permit not just a protective "frisk," but a full physical search incident to arrest. When, however, the detention did not rise to the level of a full-blown arrest ..., there appears to be no clear support at common law for physically searching the suspect. *Minnesota v. Dickerson,* 508 U.S. 366, 381, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (Scalia, J., concurring).

Yet, they are events of real constitutional and cultural significance that courts are almost entirely free from addressing. *See Illinois v. Wardlow,* 528 U.S. 119, 133 n. 7, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (Stevens, J., concurring in part and dissenting in part) (citing New York Daily News article regarding an "informal survey of 100 young black and Hispanic men living in New York City; 81 reported having been stopped and frisked by police at least once; none of the 81 stops resulted in arrests"). The exclusionary rule operates in an environment in which it is only those cases where weapons or contraband—such as the drugs in this case—are found that

receive consistent judicial scrutiny and then in the context of motions to suppress evidence.[5]

Courts are left, as a consequence, to define the overarching boundaries within which police must work in the context of discrete cases where officers make compelling, and often quite reasonable claims—as a practical if not a legal matter—that they felt in danger, and recovered probative evidence. The results—if not in each case, then as a broad trend—are predictable. Courts defer to the officer's judgment and evidence is admitted in cases where the predictions and concerns of the officers have by definition been substantiated. Al-

**5.** The civil enforcement of constitutional remedies is by and large not a productive—and consequently in my nearly two decades of experience in dealing with such issues has been an infrequently used—manner of invoking judicial scrutiny in this setting because civil rights plaintiffs face an uphill battle in enforcing the Fourth Amendment by way of alternatives to the exclusionary rule. *See* 1 Wayne R. LaFave, Search and Seizure § 1.10 (4th ed.) (noting that most of what "has been written concerning those other remedies" conclude "that these other remedies are inadequate").

[T]he potential advantages of civil suits are seldom realized. Such suits are few and far between, and therefore relatively punchless as punishing mechanisms, for a number of reasons: potential plaintiffs' ignorance of their rights and fear of police reprisals; the expense of civil litigation; the obstacles created by incarceration; and the inchoate nature of the injury (which deters lawyers as well as potential plaintiffs from bringing suit). Those suits that are brought are seldom completely successful, again for a number of reasons: the good-faith defenses available to officer-defendants; the unsympathetic nature of many plaintiffs (who are often criminals, or at least associated with criminality); the biases of juries; and, as with exclusion, the efficacy of police perjury. Even if the officer loses, he or she is often indemnified, judgment proof, or both, minimizing the impact of the verdict on the officer.

Christopher Slobogin, *Why Liberals Should Chuck the Exclusionary Rule,* 1999 U. Ill. L.Rev. 363, 385–86 (1999) (footnotes omitted).

In one study of litigation data in the Central District of California from 1980–81, the authors found that "constitutional tort plaintiffs do significantly .worse than non-civil rights litigants in every measurable way" and "are less likely to have counsel than other litigants." Theodore Eisenberg & Stewart Schwab, *The Reality of Constitutional Tort Litigation,* 72 Cornell L.Rev. 641, 677 680 (1987).

The lack of success of the vast majority of civil rights claims against federal officers (so-called *Bivens* actions), where the defendants also enjoy qualified immunity, is also illuminating. *See Vaughan & Potter 1983, Ltd. v. United States,* No. 92–F–1767, 1992 WL 235868, at *5 n. 4 (D.Col.1992) ("Out of approximately 12,000 *Bivens*-type claims brought from 1971 to 1985, only thirty plaintiffs were successful in United States district court, and some of these decisions were overturned on appeal.") (citing Perry N. Rosen, *The Bivens Constitutional Tort: An Unfulfilled Promise,* 67 N.C. L.Rev. 337, 343 (1989)); *see also* Slobogin, *supra,* at 385 n. 82 ("In the first 10 years of litigation under *Bivens,* reportedly only 13 plaintiffs out of 13,000 secured judgments.") (citing Federal Tort Claims Act: Hearings on S. 1775 Before the Senate Judiciary Comm., Subcomm. on Agency Admin., 97th Cong. 137, 142 (1982) (statement of Donald Devine, Director, U.S. Office of Personnel Management)).

though the evidence itself is ordinarily not identified as part of the formal legal analysis, it is difficult to conclude it was objectively unreasonable for the officers to believe a suspect was armed when in fact he was.

But the heart of the reasonableness analysis in such cases, it must be remembered, is a balancing of interests—the police in their physical safety and citizens in their liberty. For this to be carried out on something other than an uncalibrated scale, the real costs to be borne on both sides must be acknowledged. If *Terry* becomes an automatic frisk rule in practice,[6] the Fourth Amendment rights of citizens—particularly those driving cars in high-crime neighborhoods—will be eviscerated.[7] To avoid that result, the reality must be faced that the government will have to sacrifice certain criminal convictions where they have more than enough probative evidence to convict. That, of course, also has significant social costs. Nothing in the Fourth Amendment, nor in *Terry* and its progeny, however, excuses the imposition of such costs to purchase a measure of privacy.

Turning to the facts and circumstances informing the officers' reaction in this case: Mr. McKoy had violated two traffic ordinances; made a leaning movement when the officers first saw him; appeared nervous and avoided eye contact with the officers; and again moved as the officers got out of their unmarked cruiser and approached Mr. McKoy's car. In addition, the encounter took place in what was described as a "high-crime" area where, the officers were aware, there had been two incidents on successive evenings earlier that week when windows of private security vehicles had been shot out. The government argues that when considering the totality of the circumstances in this case, the officers were justified in frisking Mr. McKoy. In approaching the government's argument, my "inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868.

Here, the validity of the stop is not the issue. *See* note 3 *supra.* An officer need not refrain from stopping someone for a minor offense for fear the person may be dangerous. In *United States v. Villanueva*, 15 F.3d 197 (1st Cir.1994), the First Circuit addressed a hypothetical situation where a dangerous looking pedestrian crosses against a light:

> It was highly desirable, if not the duty, of the patrol officers to make their presence felt and warn against future misbehavior even though doing so, in the officers' opinion, would call for a safety search. Our sole question is the correctness of that opinion: "[W]hether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

---

6. *See* David A. Harris, *Particularized Suspicion, Categorical Judgments: Supreme Court Rhetoric Versus Lower Court Reality Under* Terry v. Ohio, 72 St. John's L.Rev. 975, 977 (1998) ("Soon, given the direction of the law, this system of categorical rules will allow police to stop and frisk almost anyone they want, with minimal interference from the courts.").

7. *See* David A. Harris, *Frisking Every Suspect: The Withering of* Terry, 28 U.C. Davis L.Rev. 1, 6 (1994) ("If ... we now think that only *automatic* frisks following *every* Terry stop can make officers safe, we should be willing not only to say so directly, but also to confront the full range of consequences of that conclusion.").

*Id.* at 199 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). The same question is before me.

It is certainly the case that while individual factors might not be sufficient, a collection of individually insufficient factors can give the police justification to frisk a detainee: "In reviewing the reasonableness of a *Terry* stop, a court must consider all of the relevant circumstances, which 'are not to be dissected and viewed singly'; rather they must be considered as a whole." *Gilliard,* 847 F.2d at 24 (quoting *Trullo,* 809 F.2d at 111) (internal citation omitted). Recognizing that officers make on the spot decisions in dangerous situations, the analysis is one of reasonable belief, not whether the officers were certain or ultimately correct about whether there was a threat. Nevertheless, vigilance regarding Fourth Amendment protections is required with recognition that a legal ruling admitting evidence in a particular factual circumstance gives the search at issue constitutional sanction. Here, that would, in essence, mean a determination that if an officer sees someone who has committed a traffic violation in a high crime area appear nervous and move *before* he is told to freeze or get out of their car, the officers can immediately frisk for weapons. Extending *Terry* this far would adopt, as a practical matter, an automatic frisk rule for anybody committing a traffic violation in a high crime area unless they exhibit no nervousness and do not move in any way. The protections of the Fourth Amendment do not permit such a conclusion, because "[t]oo many people fit this description for it to justify a reasonable suspicion of criminal activity." *United States v. Eustaquio,* 198 F.3d 1068, 1071 (8th Cir.1999). To see why this is so, I will take up the pertinent elements of the collection of circumstances the government relies upon.

■ A. *"Nervousness"*—The government attempts to justify the frisk by first citing the defendant's apparent nervousness upon seeing the officers. The case law makes clear that nervousness is a factor the police may consider. *See, e.g., Gilliard,* 847 F.2d at 25 ("[T]he officers had a very well-founded suspicion of drug activity, which, coupled with [the defendant's] nervous behavior, gave rise to a legitimate and specific concern for personal safety."). But it alone is not sufficient. Nervousness is a natural reaction to police presence. The Tenth Circuit, for instance, has "repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on ... nervousness ... 'must be treated with caution.'" *United States v. Fernandez,* 18 F.3d 874, 879 (10th Cir.1994).

Nervousness may warrant even less weight when it is manifested in particular contexts. Justice Stevens, describing the inferences to be drawn when the police see somebody flee their presence, wrote:

> Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence. For such a person, unprovoked flight is neither "aberrant" or "abnormal." Moreover, these concerns and fears are known to the police ·officers themselves, and are validated by law enforcement investigations into their own practices. Accordingly, the evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclu-

sive or insufficient. In any event, just as we do not require "scientific certainty" for our commonsense conclusion that unprovoked flight can sometimes indicate suspicious motives, neither do we require scientific certainty to conclude that unprovoked flight can occur for other, innocent reasons.

*Illinois v. Wardlow,* 528 U.S. 119, 132–133, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (Stevens, J., concurring in part and dissenting in part) (internal footnotes omitted).[8] Much the same could be said about nervousness in the presence of police officers. Additionally, motorists confronted by plainclothes officers will potentially exhibit greater anxiousness. *See Whren,* 517 U.S. at 817, 116 S.Ct. 1769 (noting that traditional traffic stops have the potential to cause significant anxiety and "[t]hat anxiety is likely to be even more pronounced when the stop is conducted by plainclothes officers in unmarked cars"). Nevertheless, the police may certainly incorporate the witnessed nervousness in assessing a situation. In a case such as this, however, they would need to tie it to significant additional factors.

■ B. *"High-Crime" Locale*—The government also cites the high-crime rate in the neighborhood (including specific knowledge of two recent evening shootings of security car windows) as a factor to be considered.[9] Police are permitted to do so; but, again, that alone is not a sufficient basis to support a frisk or even, for that matter, a stop. *See United States v. Stanley,* 915 F.2d 54, 56 (1st Cir.1990) ("Location by itself is ordinarily insufficient to justify a stop; however, 'officers may consider characteristics of the area in which they encounter a vehicle.' ") (quoting *Trullo,* 809 F.2d at 111). Therefore, while a factor, the neighborhood is one with limited significance in this case, particularly where no connection was made by the government between the nature of the crimes committed in the neighborhood and the violation suspected here.[10] As in *Unit-*

---

8. It should be added that although I base my findings on the assumption that Mr. McKoy, at least at some stage before leaving the car, knew that he was dealing with police officers, that is less than clear from the record. Therefore, there is even more reason to question the significance of his nervousness. If Mr. McKoy was not entirely sure who these men approaching him were, he had every reason to be nervous and to avoid eye contact.

The government's claim that he would have no reason to think anybody but police officers would approach him is not at all persuasive. People confront their fellow citizens with bad intentions for any number of reasons or no reason at all. It is one of the reasons the officers would be on patrol: to protect the residents of the neighborhood from such encounters. In that way, the high-crime rate of the neighborhood is not only a factor that may be considered when assessing police conduct, but also when interpreting the conduct of Mr. McKoy. In any event, even assuming Mr. McKoy was aware from the very beginning that these were police officers coming toward him, his nervousness, while a factor, gets the officers only a small measure closer to being justified to search the defendant's person.

9. The location of the stop is described as "an area of increased violence involving firearms and drug activity" in a Boston Police Incident Report dated February 6, 2003 authored by Sergeant Stratton regarding the arrest of Mr. McKoy. The February 6 report also states that "officers had knowledge of two incidents at this location where a marked security cruiser was shot at." The two shootings of security vehicle windows are the subject of a February 1, 2003 incident report by other officers.

10. Judge Bownes, in his dissent in *Trullo,* warned against the reflexive lessening of privacy interests in high-crime neighborhoods:

[W]e are asked to find reasonable suspicion on the basis of quite general characteristics of a sizeable area of the city, when the suspicion was not grounded in any specific information about date, time, or the partic-

ed *States v. Lott,* 870 F.2d 778 (1st Cir. 1989), "[t]his is not a case where the police had reason to suspect the presence of firearms based on the type of crime suspected. The only reason for the stop was a traffic violation." *Id.* at 785. No assumption about weapons can be drawn from Mr. McKoy's traffic violation. It is, unlike, for instance, a stop based on suspicion of dealing drugs, *see Gilliard,* 847 F.2d at 25 (affirming the district court's denial of a motion to suppress where "the officers ... suspected [the defendant] of having participated in a narcotics sale and knew that firearms are 'tools of the trade.'") (quoting *Trullo,* 809 F.2d at 113), or of committing a crime often involving firearms, *see Walker,* 924 F.2d at 4 (noting, in denying a motion to suppress, the officer's "experience that burglars often carry weapons or other dangerous objects"). Nor is there any indication that they suspected Mr. McKoy was involved in the two recent nighttime shootings of security car windows. It is not enough to say that such events occur in the area or even that two specific events occurred recently in the neighborhood, for then everybody stopped for a traffic violation that week would be subject to the presumption regardless of whether their conduct could fairly be interpreted as dangerous.[11]

■ *C. "Movements"*—As already noted, it was natural to exhibit some nervousness in the presence of police officers. Without a more specific showing that this was such disproportionate nervousness that it can suggest consciousness of guilt of some crime involving dangerous weapons, I cannot find that simply looking nervous and avoiding eye contact with police in a high-crime area after committing a traffic violation provides sufficient grounds to frisk. The government, however, adds an additional layer to be considered in the analysis: that Mr. McKoy was seen leaning forward and moving his right arm. The real question, then, becomes whether nervousness in a high-crime area, when combined with the movements made by the defendant, provided the officers with the "reasonable belief [Mr. McKoy was] armed." *Terry,* 392 U.S. at 30, 88 S.Ct. 1868.

Certain movements enter into the equation when considering the totality of the circumstances confronting police officers. Attempting to meet their burden in this case, the government analogizes the situation here to those in a number of cases where what were labelled "furtive gestures" were cited by courts denying motions to suppress evidence. In so doing, however, the government's argument veers close to proposing that movement by someone being approached by a police officer is by definition furtive. That is not the

ular individuals.... It would seem that, for the court, the [neighborhood] is a per se region of lessened expectation of privacy, at all times of the day and at all periods of the year, where practically unlimited deference is granted to police officers' discretion.... [T]he court ... has effectively eliminated any fourth amendment scrutiny of police suspicions concerning activity [in that part of the neighborhood].
*Trullo,* 809 F.2d at 116 (Bownes, J., dissenting).

**11.** *See* Margaret Raymond, *Down the Corner, Out in the Street: Considering the Character of*

*the Neighborhood in Evaluating Reasonable Suspicion,* 60 Ohio St. L.J. 99, 100–01 (1999) ("Observations of minimal significance are sometimes elevated to reasonable suspicion based on the character of the neighborhood in which the suspect is found; in a 'high-crime' area, standing on a street corner or sitting in a parked car have been held to amount to reasonable suspicion that criminal activity is afoot. Such cases raise the significant danger that persons are being subjected to stops based on the neighborhoods in which they are found, rather than the behavior in which they engage while in a particular neighborhood.") (footnotes omitted).

case. The movement must be interpreted in context to determine if it is actually furtive, if it in fact gives rise to a reasonable belief that the suspect is armed and dangerous.

Even after fully considering the movement under the totality of the circumstances, I find that the government has failed to show that the frisk of Mr. McKoy was permissible. The cases relied upon provide excellent examples of when officers may frisk a suspect. But they are quite different from the record in this case. An extended discussion will illustrate how far this case is from those properly permitting a frisk.

In *United States v. Nash,* 876 F.2d 1359 (7th Cir.1989), for instance, the officer witnessed the defendant make a "furtive gesture," lifting himself off the seat and reaching down. Approaching the car alone, the officer did not immediately remove the passenger and frisk him. Instead, he noted that the defendant appeared unkempt and smelled of alcohol. Additionally, there was a German Shephard in the back seat of the car, and the defendant had a jacket tucked under his lap that extended to the floor of the car. At this point, the officer requested that the defendant leave the vehicle and then reached into the car to see what might be hidden beneath the jacket. He then took the defendant to the patrol car to conduct a pat-frisk of his person. The proposition for which *Nash* stands is that a sole officer, approaching a car driven by someone who appears disheveled and drunk and having witnessed movement toward an area of the car where he later sees something that could obscure a weapon, may conduct a limited search for weapons. *See id.* at 1361 ("The jacket covered the area in which [the defendant] appeared to have hidden something when he made the 'furtive gesture'. These two facts, the furtive

gesture and the position of the jacket, warranted [the police officer's] belief that a search was necessary for his safety."). The defendant in *Nash* is like Mr. McKoy in that they both made volitional movements, but that does not make them similarly furtive.

The government also cites the Seventh Circuit's decision in *United States v. Denney,* 771 F.2d 318 (7th Cir.1985), for the proposition that a defendant's furtive gesture of moving toward the right side of his vehicle is properly considered by courts as a factor when assessing the permissibility of a frisk. While that is technically true, a closer analysis of the case reveals why the movement was deemed to be threatening. In *Denney,* Drug Enforcement Administration agents and police officers were executing a search warrant on a house they believed contained firearms. Nearing completion of the search, they witnessed a truck being driven at high speed up the gravel road leading to the house. The truck came to a skidding halt near some of the officers. At that point, a special agent identified himself, drew his gun, and ordered the driver to raise his hands and get out of his truck. The driver did not do so, and after a second command by the agent, moved toward the center of the truck. *See id.* at 322 (finding that the defendant's "refusal to cooperate with the officer's request to keep his hands in sight and to exit the truck intensified the officers' reasonable concerns for their safety"); *see also United States v. Johnson,* 212 F.3d 1313, 1316 (D.C.Cir.2000) (finding a stop permissible where the officer "made a show of authority but [the defendant] had not submitted to it" and subsequently made furtive gestures). The officers responded by approaching the truck with guns drawn and physically removed him from the vehicle, after which they conducted a protective sweep of the truck's interior.

The "furtive gesture" in *Denney* teaches that movement alone is not what courts are to consider, but rather movement signifying danger within a particular context. Applying the ruling in *Denney* to the case before me—a case where there was no other indication of firearms, no aggressive behavior by the defendant, and no exertion of authority and disobedience of that authority before the movement at issue—would do "enormous violence to context." *Blackie v. Maine*, 75 F.3d 716, 722 (1st Cir.1996) (Selya, J.).

The government also relies on *United States v. Moorefield*, 111 F.3d 10 (3d Cir. 1997), where the court found the frisk of a passenger in a car to be constitutional in part due to furtive movements by the passenger. Unlike here, and similar in this regard to *Denney*, the movements in *Moorefield* occurred after a police officer instructed the passenger to put his hands in the air:

> [I]n response to [the officer's] instruction to [the defendant] to remain in the vehicle with his hands in view, [the defendant] attempted to exit the vehicle and then raised and lowered his hands several times. In addition, [the defendant] leaned back and appeared to shove something down toward his waist.

111 F.3d at 14; *see also Stanley*, 915 F.2d at 57 (noting that frisking the defendant was reasonable after the officer ordered the stopped suspect to freeze and "[the defendant] ... ignored the order and lunged toward the passenger's side of the car" during a nighttime encounter in a rear parking lot where drug transactions were known often to take place). There is no indication here that when the officers exerted their authority over Mr. McKoy he disobeyed them in any way. If the officers were uncertain about what the defendant was doing, they were free to declare their status as police officers and demand he remain still. If an officer can simply frisk someone immediately in such a circumstance before exerting his authority, a motorist pulled over for a broken taillight, for instance, will be deemed dangerous if he reaches for his registration, turns off the radio, or puts the car in park. While I recognize that all such movements can also indicate reaching for a weapon, that is true of almost any movement made by someone sitting in a car. That, however, does not by definition make all movements furtive.

There is also no testimony in this case that the officers saw any physical indications that the defendant was armed, unlike, for instance, *United States v. Mitchell*, 951 F.2d 1291 (D.C.Cir.1991), where the court affirmed the district court's denial of a motion to suppress in part because of "furtive gestures" witnessed by a police officer. Once again, the officer witnessed more concrete factors evidencing danger in *Mitchell* than are present here. There, the car was stopped after initially failing to obey orders to pull over. An officer approached the passenger window of the stopped car after a fellow officer had returned to the police cruiser to run a check on the vehicle. The officer witnessed the passenger in the car moving his hands within his jacket and, growing concerned, asked him to step out of the car. Not immediately frisking the passenger, the officer further noted that the passenger was sweating and asked him why. The passenger said he was hot, to which the officer responded "if you're hot why don't you take your coat off." *Id.* at 1294. The passenger did so and the officer saw a bulge under the man's sweater he believed was a gun. It was only then that he ordered the passenger to put his hands on the car and, subsequently, withdrew a gun

from the passenger's pants.[12]

Finally, as already noted, no inferences could be drawn from the type of crime Mr. McKoy was suspected of committing. This is important to remember when attempting, as the government does, to analogize this case to ones such as *United States v. Cole*, 276 F.Supp.2d 146 (D.D.C. 2003). The *Cole* court considered the defendant's furtive movements,[13] finding that the officers had sufficient grounds to believe the driver was armed because they "saw in the early morning hours a speeding car that matched the description of a car seen leaving a shooting two hours earlier in the same area. The driver kept driving for blocks after [the officer] turned on his emergency lights and siren, and the driver leaned forward and fumbled under the seat after he stopped." *Id.* at 152–53. Again, there is no additional informing factor, such as a suspected violent crime or a late-night encounter, in the case at hand. Although there had been two recent nighttime shootings, there was no indication of any connection of the defendant to such violent acts other than his physical presence in the neighborhood.

One case cited by the government in its attempt to show that the search was justified could be read to admit evidence in circumstances no more suspicious than those in this case. In an unpublished D.C. Circuit opinion, *United States v. Draine*, 48 F.3d 562 (Table), 1995 WL 66735 (D.C.Cir.1995), the defendant "engaged in a furtive movement which justifiably caused the police officer to be concerned for his safety and provided a legitimate basis for an investigative detention and protective frisk." *Id.* at *1. The driver there was stopped for failure to display his front license plate properly and for the heavy tint on his windows, both traffic violations. It is not clear whether the court based its finding on the furtive gestures—not described in the opinion—alone or whether the tinted windows were also considered. In any event, to the extent the court's opinion is read to stand for the proposition that undefined movement conclusorily termed furtive, without more, in a stopped vehicle would warrant immediate frisking of the driver or passenger, I find its application of *Terry* too broad. The opinion, in any event, offers little in the way of explanation for its holding.

■ In sum, the only indications in this case that Mr. McKoy was dangerous were (a) generalized notions regarding the neighborhood, not inferences drawn from his suspected crime, and (b) movements and nervousness in the presence of police, not physical reactions in contravention of an order to stop moving or apparent efforts at concealment. To admit the evidence would be a legal determination that if one commits a traffic violation in a high-crime neighborhood he will be subject to a frisk whenever he appears nervous and moves. The case law does not support such a simplistic and far-reaching conclusion and I decline to adopt it.

## III. CONCLUSION

For the reasons stated above, the mo-

---

**12.** The government also references an unpublished opinion by the First Circuit, *United States v. Greene*, 129 F.3d 1252 (Table), 1997 WL 642275 (1st Cir. Oct.14, 1997), where the defendant—a passenger in a stopped cab—appeared nervous. In that case, however, the officer "observed a large bulge in appellant's right pants pocket" which he believed was a weapon. *Id.* at *1.

**13.** The court did discuss the issue although it did not need to reach the question as to the driver, since he was challenging a search of a fellow passenger, a claim for which he had no standing.

tion to suppress is GRANTED.[14]

---

14. The defendant also seeks to suppress the evidence in this case by arguing that the officer, upon feeling the marijuana, was not immediately able to discern that it was contraband pursuant to the "plain feel" doctrine. In addition, he contends that the officer's subsequent question regarding the substance violated his *Miranda* rights. Because the evidence will be excluded on other grounds, it is unnecessary to reach these questions. I note, however, that for the protections of *Miranda* to apply, the subject must be both in custody and subject to an interrogation. In this case, Mr. McKoy was simply the subject of an investigatory stop at the time he got out of his car and was frisked.

Additionally, the officer did not immediately seize the contraband upon feeling it. Instead, he inquired of the defendant what it was. Absent custody, the officer was free to ask, and the defendant was free not to respond. He did respond, however, and upon the defendant's answering, the officer had probable cause to arrest him and did so. The seizure and subsequent search—if the initial frisk had been permissible—would have been incident to that lawful arrest.