[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 19, 2005
THOMAS K. KAHN
CLERK

No. 04-12600
Non-Argument Calendar

_____

D. C. Docket No. 03-00039-CR-1-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PEDRO BENITEZ-MACEDO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 19, 2005)

Before BIRCH, BARKETT and MARCUS, Circuit Judges.

PER CURIAM:

Pedro Benitez-Macedo appeals his 33-month sentence, imposed pursuant to

his guilty plea, for being an illegal alien in possession of firearms, in violation of

18 U.S.C. § 922(g)(5).  On appeal, Benitez-Macedo argues that the district court

erred by (1) denying his motion to suppress evidence seized during a warrantless search of his car, and (2) enhancing his offense level by four, pursuant to U.S.S.G. § 2K2.1(b)(5), for possessing a firearm during the commission of another felony offense.[1]

---

[1]Benitez-Macedo also argues, for the first time on appeal, that the § 2K2.1(b)(5) enhancement violated Blakely v. Washington, 542 U.S. --, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). After the filing of the briefs in this case, the Supreme Court extended Blakely to the Federal Sentencing Guidelines. See United States v. Booker, 543 U.S. __, 125 S. Ct. 738 (2005). Because he did not raise this issue in the district court, he must show plain error to warrant reversal on this basis. We will correct plain error only where (1) there is an error; (2) the error is plain or obvious; (3) the error affects the defendant's substantial rights in that it was prejudicial and not harmless; and (4) the error seriously affects the fairness, integrity, or public reputation of a judicial proceeding. See United States v. Rodriguez, __ F.3d __, 2005 WL 272952, at *6 (11th Cir. Feb. 4, 2005); see also Booker, 125 S.Ct. at 769 (stating that the plain error rule applies and will prevent a new sentencing hearing from being necessary in every case on direct appeal involving a pre-Booker sentence).

We have made clear that a defendant who fails to show that there is a reasonable probability of a different sentence if the Guidelines had been applied in an advisory fashion cannot satisfy the third prong of plain-error review. See United States v. Rodriguez, __ F.3d __, 2005 WL 272952, at *9 (11th Cir. Feb. 4, 2005); see also United States v. Duncan, 2005 WL 428414, at *1 (11th Cir. Feb. 24, 2005) (applying Rodriguez and finding that defendant did not meet his burden of showing Booker affected his substantial rights). To establish that the error affected his substantial rights, Benitez-Macedo's burden is to show that the error "'must have affected the outcome of the district court proceedings.'" Rodriguez, 2005 WL 272952, at *7 (quoting United States v. Cotton, 535 U.S. 625, 632, 122 S.Ct. 1781, 1786, 152 L.Ed.2d 860 (2002) (citation omitted)). "The standard for showing that [an effect on the outcome] is the familiar reasonable probability of a different result formulation, which means a probability "'sufficient to undermine confidence in the outcome.'" Rodriguez, 2005 WL 272952, at *7 (quoting United States v. Dominguez Benitez, --- U.S. ----, 124 S. Ct. 2333, 2340, 159 L. Ed. 2d 157 (2004)).

Like in Rodriguez, Benitez-Macedo's Blakely (now Booker) claim consists solely of arguing that based on the Blakely decision alone, he is entitled to a new sentencing hearing. Simply put, the fact of the Blakely and intervening Booker decisions is insufficient to satisfy plain error, as even the Supreme Court recognized in Booker when it observed that not every appeal will lead to a new sentencing hearing. See 125 S.Ct. at 769 ("That fact [the retroactive application of the decision to cases on direct review] does not mean that we believe that every sentence gives rise to a Sixth Amendment violation. Nor do we believe that every appeal will lead to a new sentencing hearing."). We find no plain error based on Blakely or Booker in this case.

We review a district court's denial of a motion to suppress under a mixed standard of review, reviewing the court's findings of fact for clear error and its application of law to the facts de novo. See United States v. Gil, 204 F.3d 1347, 1350 (11th Cir. 2000). We review purely legal questions concerning use of the Sentencing Guidelines de novo, United States v. Williams, 340 F.3d 1231, 1234 n. 8 (11th Cir. 2003), and a sentencing court's factual findings for clear error, see United States v. Jackson, 276 F.3d 1231, 1233 (11th Cir. 2001). After the Supreme Court's recent decision in United States v. Booker, __ U.S. __, 125 S.Ct. 738 (2005), we review a district court's sentencing scheme for reasonableness.

Upon thorough review of the record, as well as careful consideration of the parties' briefs, we find no reversible error and affirm.

The relevant facts are straightforward. On August 19, 2003, Benitez-Macedo and co-defendant Silvano Garcia-Rebollar were indicted with one count of being illegal aliens in the United States, aided and abetted by one another, who knowingly possessed two firearms, Smith & Wesson (models 639 and 3904) nine-millimeter semi-automatic handguns, in violation of 18 U.S.C. § 922(g)(5). After pleading not guilty, Benitez-Macedo filed a motion to suppress evidence seized during a traffic stop of his car, arguing that officers did not have reasonable

3

suspicion to perform a Terry[2] stop because the officers relied solely on an anonymous tip.

The government responded that: (1) the stop of Benitez-Macedo's vehicle was permissible under Terry because the officers had reasonable suspicion, based on a radio dispatch about a shooting at a nearby apartment building, which included a description of Benitez-Macedo's truck, including its license plate number, and because the driver was alcohol-impaired; and, alternatively, (2) the stop was permissible based on probable cause because Benitez-Macedo had violated a Georgia traffic law.

The magistrate judge conducted an evidentiary hearing on the motion to suppress. Sergeant John Robertson of the Gainesville Police Department ("GPD") testified that at around 2:00 a.m. on April 4, 2003, while on routine patrol and accompanied by a police trainee, he heard, over the police radio, a report that shots had been fired into a nearby occupied apartment. The report contained a general description of one of the persons inside the vehicle and a description of the vehicle -- a 1995 Chevrolet Silverado pickup with an extended cab that was burgundy or dark in color and had a Georgia license plate number 4592AHK.

On the police radio, Officer Brad Baker called in and indicated that he could

---

[2] See Terry v, Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

see a vehicle that met the description in a location less than a mile away from the apartment where the shooting occurred. At that point, Sergeant Robertson told Baker to "stand by" because he (Robertson) was about one minute away. Sergeant Robertson then proceeded to pull up behind Benitez-Macedo's vehicle, which was "halfway across the stop bar sitting at a red light," and confirmed the license plate number with dispatch. Officer Baker indicated over the radio that the vehicle had been sitting at the traffic light while the lights had cycled from green to red twice.

Sergeant Robertson testified that just after he had confirmed a match of the vehicle, the vehicle began to pull away and he decided to conduct a "felony traffic stop based on the call that had been given out." Sergeant Robertson explained that he performed this type of stop -- which consists of safety measures where the officer does not just pull the vehicle over and walk up to the window of the stopped car -- based on officer safety concerns prompted by the radio-call information that the occupants of the car were armed. Sergeant Robertson turned on his police blue light and Benitez-Macedo pulled over within approximately an eighth of a mile. Thereafter, Sergeant Robertson and Officer Baker pulled up to the stopped vehicle, at which point flood lights and take-down lights were activated to illuminate the inside of the truck. The three officers (Robertson, Baker, and the trainee officer) exited their vehicles, drew their guns, and called out

5

toward the truck: "driver, stop the car, place it in park, drop the keys out the window, keep your hands up where we can see them."

The occupants did not respond to the police command for approximately a minute and a half, during which time the brake lights remained illuminated, indicating to Sergeant Robertson that the driver's foot was resting on the brake pedal. The officers repeated the command in Spanish, and Sergeant Robertson noticed that both the driver's and passenger's attention was drawn to the center console of the vehicle, and their hands were not visible to the officers. As Robertson described it at the suppression hearing, "[t]here was a lot of movement as well as non-compliance with keeping their hands where we could see them." At that point, Robertson had "safety concerns as to what they may be doing in the vehicle."

After about a minute and a half, the defendants complied with the command and both were removed from the vehicle, patted down, handcuffed, and placed in separate police cars. After removing the defendants, Sergeant Robertson returned to the stopped vehicle to "make sure there was no other occupants hidden inside the vehicle," and approached from the passenger side to "clear the vehicle." Upon approaching the vehicle, Robertson noticed a spent shell casing for a nine-millimeter firearm lying on the ground outside the passenger-side door, which had

6

remained open after Garcia-Rebollar got out. Through the open door, Sergeant Robertson observed several other casings on the passenger-side floor of the vehicle.

After observing the shells, the officers "began a quick frisk search of the vehicle" and Sergeant Robertson looked into the center console where the occupants had earlier been focused and found two nine-millimeter firearms. One firearm was slide-locked to the rear, indicating that it had been fired until empty, and the other firearm was loaded to capacity with the hammer cocked. There also was a half-empty box of shells inside the console along with one white glove.

The magistrate judge issued a Report and Recommendation ("R&R") in which she recommended denying the motion to suppress because either the officers had a reasonable and articulable basis to make an investigatory Terry stop of the pick-up truck based on the call reporting shots fired at the nearby apartment building, or, irrespective of the existence of Terry reasonable suspicion, the officers had probable cause to stop the vehicle for violations of two Georgia statutes: O.C.G.A. §§ 40-6-20 (requiring drivers to obey the instructions of a traffic control device) and 40-6-21 (requiring drivers to stop at a stop line when facing a circular red signal). Additionally, the magistrate judge found that the search of the vehicle was reasonable for the protection of the officers' personal safety and under

7

the well-settled automobile exception to the warrant requirement.

Benitez filed objections to the R&R, arguing, inter alia, that (1) O.C.G.A. § 40-6-21(a)(3)(A) could not form the basis for probable cause because the officer admitted he did not rely on a violation of that statute to make the stop; (2) O.C.G.A. § 40-6-21(a)(3)(A) did not apply to a conventional traffic light that has the capability to display either a red, yellow, or green signal; (3) the government did not prove that O.C.G.A. § 40-6-20(a) applied because it did not prove that there was "an official traffic-control device" at the intersection of the stop; and (4) the amount of information the officers had before them at the time of the traffic stop was an insufficient basis upon which to perform a Terry stop.

The district overruled Benitez-Macedo's objections. The district court found that the officers has probable cause to stop the vehicle based on Benitez-Macedo's violation of O.C.G.A. § 40-6-21(a)(3)(A), which required Benitez-Macedo to stop "at a clearly marked stop line." The district court observed that Benitez-Macedo violated this law by stopping "over the line," and thus the officer had probable cause to initiate the traffic stop. Based on this conclusion, the court found it "unnecessary to decide if th[e] seizure was also valid based on reasonable suspicion developed from the 911 information." Benitez-Macedo then entered a conditional guilty plea, reserving the right to appeal the district court's denial of

his motion to suppress.

At sentencing, the Presentence Investigation Report ("PSI") assigned a base offense level of 14, pursuant to U.S.S.G. § 2K2.1, and recommended the following adjustments: a 2-level enhancement based on the fact that one of the firearms had the serial number removed, U.S.S.G. § 2K2.1(b)(4); a 4-level enhancement for Benitez-Macedo's possession of a firearm in connection with another felony offense (the aggravated assault resulting from the shots being fired into the apartment), U.S.S.G. § 2K2.1(b)(5); and a 3-level reduction for acceptance of responsibility, U.S.S.G. §§ 3E1.1(a) and (b). Based on an adjusted offense level of 17 and a criminal history category of II, the sentencing guideline range was 27 to 33 months. Benitez-Macedo objected to the PSI, arguing, in relevant part, that he should not have received the § 2K2.1(b)(5) enhancement because it was not he but his co-defendant who shot the firearm and because shooting into an apartment is not a felony under Georgia law.

In response to Benitez-Macedo's objections, at the sentencing hearing, the government argued that the shooting into the apartment was both a joint action on Benitez-Macedo's and his co-defendant's parts and a felony offense in Georgia, namely criminal damage to property in the first degree (in a manner so as to endanger human life). In support of its contention that the shooting was a joint

9

action for sentencing purposes, the government presented the testimony of FBI Special Agent John Houston who had interviewed Garcia-Rebollar after the shooting. Garcia-Rebollar stated that he and Benitez-Macedo "drank some beers that night and wanted to look for an individual that owed them money, and they intended on scaring the individual." Both men were armed with guns when they proceeded, at 2:00 a.m., traveling in Benitez-Macedo's truck, to look for the person who owed them both money.

A second government witness, GPD Detective Jay Parrish, had responded to the scene of the shooting and found eight shell casings on the ground outside of the sliding glass door of the apartment, which had been shattered. He testified that all eight bullets had gone through the sliding glass door into the targeted apartment. Three of the bullets had continued through the targeted apartment and into the apartment immediately behind it. The apartment behind the targeted apartment was inhabited by two women. One bullet had gone through both apartments and come out on the other side of the building. Three rounds had gone into the ceiling of the targeted apartment while another had come into the apartment at waist or chest level. When Detective Parrish arrived, he found several people present in the targeted apartment, including a mother and her children who had been asleep in the apartment.

The district court found that the two defendants were on a "joint mission" and several of the bullet holes appeared to be approximately waist-high and fired at 2:00 a.m., a time when most people are home. The district court overruled the objection to the § 2K2.1(b)(5) enhancement and sentenced Benitez to a 33-month term of imprisonment, followed by a 3-year term of supervised release. This appeal followed.

First, Benitez-Macedo argues the district court erred by finding that there was probable cause to arrest him when he was stopped in a vehicle on top of a line when O.C.G.A. § 40-6-21(a)(3)(A) requires only that vehicles stop "at" the line. Because we conclude that the officers were justified in stopping Benitez-Macedo's car based on the lesser standard of reasonable suspicion.[3] Cf. United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989) (noting that reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence" and less than probable cause, which is "'a fair probability that contraband or evidence of a crime will be found.'"(citation omitted)).

The police may stop and briefly detain a person to investigate a reasonable suspicion that he is involved in criminal activity, even though probable cause is

---

[3] It is well-settled that we can affirm the district court's decision on "any ground that finds support in the record." United States v. Mejia, 82 F.3d 1032, 1035 (11th Cir. 1996).

lacking. United States v. Williams, 876 F.2d 1521, 1523 (11th Cir. 1989). To justify pulling a vehicle over for a Terry stop, the police officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21, 88 S.Ct. at 1880. "The 'reasonable suspicion' must be more than an 'inchoate and unparticularized suspicion or hunch.'" Id. Rather, the Fourth Amendment requires that the police officer articulate facts that provide some minimal, objective justification for the stop. Williams, 876 F.2d at 1524. In reviewing the totality of the circumstances facing an officer at the time of the stop, we give due weight to the officer's experience. United States v. Briggman, 931 F.2d 705, 709 (11th Cir. 1991).

After an evidentiary hearing, the magistrate judge found the officers had a sufficiently reasonable and articulable suspicion to conduct a Terry stop. We too are satisfied that the information known to the police -- the fact that the vehicle matched the description given in the call, including the make, model, and license number; the vehicle was spotted at 2:00 a.m. less than a mile from the scene where the shots were fired and within minutes of the "shots fired" report; and the vehicle remained stopped at the intersection, across the stop bar, while the traffic lights cycled twice from green to red -- was sufficiently "specific and articulable" to

12

justify the stop.  See Terry, 392 U.S. at 21, 88 S.Ct. at 1880.  The underlying information contained more than a "bare-boned tip[] about guns," as Benitez-Macedo suggests.  Cf. Florida v. J.L., 529 U.S. 266, 273, 120 S. Ct. 1375, 1380, 146 L. Ed. 2d 254 (2000) (holding anonymous tip that described only subject's "readily observable location and appearance . . . does not show that the tipster has knowledge of concealed criminal activity.").  Simply put, the information the officers had was more than an "inchoate and unparticularized suspicion or hunch." Cf. United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989).  Based on the experience of the officers and the "totality of the circumstances," the officers had the requisite "particularized and objective basis" for suspecting legal wrongdoing and making a Terry stop.  Accordingly, we affirm the denial of the motion to suppress.[4]

We likewise are unpersuaded by Benitez-Macedo's sentencing challenge. Section 2K2.1(b)(5) states that a defendant's offense level should be increased by four levels if, inter alia, "the defendant used or possessed any firearm . . . in connection with another felony offense."  U.S.S.G. § 2K2.1(b)(5).  "[A]nother felony offense" includes any state offense that is "punishable by imprisonment for

---

[4] Benitez does not contest the magistrate judge's findings regarding the subsequent search other than to argue that it was invalid because the stop was not supported by probable cause or reasonable suspicion.

a term exceeding one year, whether or not a criminal charge was brought." U.S.S.G. § 2K2.1, comment. (n.7). Although § 2K2.1(b)(5) does not define the phrase "in connection with," we read this phrase expansively. United States v. Rhind, 289 F.3d 690, 695 (11th Cir. 2002).

Under Georgia law, a person commits the offense of criminal damage to property in the first degree when he "knowingly and without authority interferes with any property in a manner so as to endanger human life." O.G.C.A. § 16-7-22(a). This is a felony offense because a "person convicted of the offense of criminal damage to property in the first degree shall be punished by imprisonment for not less than one nor more than ten years." Id. § 16-7-22(b).[5] On this record, it is clear that under Georgia law, shooting into an occupied apartment at 2:00 a.m., including firing some shots at waist-level, is a felony within the meaning of § 16-7-22(a). [6] Accordingly, the district court did not err by

---

[5] The Georgia Supreme Court has interpreted the phrase "so as to endanger human life," and upheld a conviction under this section where the evidence established that a defendant:

> . . . fired a gun at night into an inhabited dwelling where residents were likely to be present, thus recklessly endangering the life of another. The fact that the occupants of the house were not physically present does not lessen the risk of danger to others or the recklessness of his behavior.

Carthern v. State, 529 S.E.2d 617, 620 (Ga. 2000).

[6] To the extent Benitez-Macedo suggests the district court's factual finding that he was involved in a "joint enterprise" with Garcia-Rebollar was clear error, in light of the government's unrebutted evidence at sentencing, we are unpersuaded.

enhancing the base offense level four additional levels for possession of weapons in connection with another felony offense, pursuant to U.S.S.G. § 2K2.1.

**AFFIRMED.**