THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANGELIA K. DAVENPORT, Defendant-Appellant.

Third District   No. 3—05—0812

Opinion filed May 29, 2009.—Rehearing denied June 29, 2009.

20

SCHMIDT, J., dissenting.

Bryon Kohut, of State Appellate Defender's Office, of Ottawa, for appellant.

Terence M. Patton, State's Attorney, of Cambridge (Terry A. Mertel and Dawn D. Duffy, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CARTER delivered the opinion of the court:

The defendant, Angelia K. Davenport, was charged with cannabis trafficking, unlawful possession of cannabis with intent to deliver, and unlawful possession of cannabis (720 ILCS 550/5.1(a), 5(g), 4(g) (West 2004)). She filed a pretrial motion to suppress evidence, which the circuit court denied. Following a jury trial, the defendant was found guilty as charged. After merging the lesser offenses with the Class X trafficking charge, the court sentenced the defendant to 12 years of imprisonment and imposed fines, costs, and fees. The defendant appealed, arguing that: (1) the court erroneously denied her motion to suppress; (2) the prosecutor impermissibly impeached her with her postarrest silence; (3) she is entitled to monetary credit for the time she spent in presentence incarceration; and (4) a $20 fee imposed for collection of a genetic marker specimen must be vacated. On direct appeal, this court affirmed the defendant's conviction, modified her sentence in part, and vacated the $20 collection fee. *People v. Davenport*, No. 3—05—0812 (2007) (unpublished order under Supreme Court Rule 23).

In a supervisory order dated November 26, 2008, the supreme court directed us to vacate judgment and reconsider our decision in

light of *People v. Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603 (2008). After reconsideration, we reverse and remand.

## FACTS

At the suppression hearing, the State presented the testimony of Illinois State Trooper Clint Thulen and a video recording of his May 5, 2005, stop of a white Honda sports utility vehicle and his arrest of its occupants. The evidence established that at 11:15 a.m., Thulen, who drove an unmarked canine vehicle, pulled the Honda over. The Honda was bearing Colorado plates, and it was traveling eastbound along Interstate 80 near milepost 19 in Henry County. The Honda slowed considerably when it passed Thulen's vehicle. Thulen said he clocked the Honda at 70 miles per hour in a 65-mile-per-hour zone.

Thulen approached the vehicle on the passenger side. The defendant, who was seated in the front passenger seat, opened the door and handed Thulen her mother's driver's license. She told Thulen that the vehicle belonged to her husband and indicated to Thulen that she was an owner of the vehicle. The defendant's mother, Catherine Cagle, was the vehicle's driver. A third individual, who was later identified as Jose Manuel Vasquez Rodriguez, occupied the rear passenger seat. Thulen told the travelers that he was going to write a warning ticket for speeding. He testified that all three seemed unusually nervous. Rodriguez moved his hands under a coat on his lap, and Thulen considered this a "furtive" movement. He ordered Rodriguez to show his hands and asked to see the coat. After determining that there were no weapons in the coat, Thulen returned it and escorted Cagle to his vehicle to write the warning ticket.

Thulen initiated a license check and engaged Cagle in conversation. Cagle told Thulen that she was going to Michigan to visit family. While Thulen was writing the ticket, a message was radioed informing him that Cagle had prior arrests for various offenses, including possession of controlled substances. Thulen said Cagle reacted by turning away from him and staring out the passenger window. He said her level of nervousness heightened, her lip trembled, and she appeared worried.

Thulen then asked if there was anything illegal in the car. Cagle responded, "Not that I know of." This response concerned Thulen, because he considered it untruthful. He called for backup and asked Cagle if he could search the vehicle. Cagle said it was not her vehicle and she could not consent to a search. Thulen asked if he could conduct a canine sniff of the vehicle, and Cagle again responded that she could not consent because she did not own the vehicle. Thulen asked Cagle if she would have a problem with his searching the vehicle if it was

okay with the defendant. Again, Cagle said she had no say in the matter. Thulen finished writing the warning ticket and told Cagle she was free to go. However, he then asked if she would remain in his vehicle while he spoke to the defendant. Cagle agreed to do so.

In his training as a peace officer, Thulen had learned that Colorado was a hub for the distribution of illegal drugs, and substantial amounts of cocaine and marijuana were being transported throughout the country from Denver and Colorado Springs. He also knew that Interstate 80 was a main corridor for the transportation of illegal drugs. Based on this knowledge, together with his observations during the stop and the information he had received regarding Cagle's prior arrests, he suspected that the vehicle contained contraband.

Thulen told the defendant to put her shoes on and exit the vehicle. Thulen then asked the defendant if he could conduct a canine sniff of the vehicle. He explained that he had observed some indicators of criminal activity. The defendant denied consent for both a canine sniff and a search. Thulen asked Rodriguez to exit the vehicle and told them they were free to leave. He said he was going to detain the vehicle, however, for a canine sniff. Cagle joined the defendant and Rodriguez on the side of the road, and Thulen explained that they could walk away, hop the fence, or he could help them secure a ride.

The three travelers began walking along the shoulder of the highway and stopped a short distance from the vehicle. Thulen led his drug detection dog to the Honda. After the dog took an interest in the rear of the vehicle, Thulen led the dog around to the driver's side of the vehicle. The dog leaped through an open window on the driver's side of the vehicle and alerted at luggage in the cargo area. Thulen returned the dog to his vehicle and conducted a manual search of the Honda. He located a duffle bag full of cellophane-wrapped bundles of suspected cannabis in the cargo area. Thulen immediately ordered the three travelers to halt, as they had resumed their slow walk from the vehicle, and placed them under arrest. Sergeant Floyd Blanks arrived in response to Thulen's request for backup assistance. After securing the travelers, the officers found another container of suspected cannabis in the back of the Honda under a bag of toiletries and a pair of women's jeans.

Thulen said he had a sinus infection on the date of the arrest, and he was unable to detect the odor of the cannabis until he opened the rear door to the cargo area of the Honda in response to the dog's alert.

Cagle and the defendant testified in support of the motion to suppress. Cagle said she had had mouth surgery in January 2005, and she still had trouble speaking with her new dentures. She denied that she was acting nervous or upset during the stop or upon hearing her

criminal history when it was broadcast on Thulen's radio. She also testified that the defendant did not appear nervous or upset during the stop.

The defendant testified that her husband owned the vehicle, but she used it as if it were her vehicle. She stated that they were not speeding when they passed Thulen's vehicle. She said her mother never speeds. She disagreed with Thulen at the scene and told him they were traveling at 60 miles per hour before they were stopped. She corroborated Cagle's testimony that neither of them was nervous during the stop. The defendant said she did not know Rodriguez before the trip. She explained that Rodriguez's uncle was a friend. He had asked her to drop Rodriguez off in Chicago, where he had a job lined up.

Finally, Blanks testified that he noted the smell of cannabis emanating from the Honda when he approached the rear of the vehicle.

Following arguments of counsel, the circuit court denied the defendant's motion to suppress. The court found that the initial stop was valid because the Honda was speeding, and the totality of the circumstances observed by Thulen during the stop gave rise to less than probable cause, but more than a hunch that criminal activity was afoot. The court found that Thulen had a reasonable suspicion of criminal activity that authorized his investigation into possible drug trafficking. Accordingly, the court ruled that the defendant was not illegally detained during the search of the vehicle.

At trial, the defendant stipulated that forensic testing proved that 6,714 grams of plant material removed from 5 of the packages in the Honda was cannabis, and an additional 11 packages contained 15,145 grams of plant material. It was also established that the Honda was owned by the defendant's husband, Jose Fuentes. In addition to Thulen and Blanks, whose testimony was generally consistent with the testimony presented at the suppression hearing, the State called Rodriguez as a witness. Rodriguez gave his name and then invoked his fifth amendment right against self-incrimination.

The defendant testified that, prior to her arrest, she had no knowledge that there was cannabis in the vehicle. She said Cagle was chain-smoking cigarettes during the trip, and the smoke bothered her. She said she followed Rodriguez as they walked along the shoulder of the highway after Thulen told them they were free to leave. She asked Rodriguez what was going on, but he did not respond to her question. She said she suspected from his demeanor that he knew something was wrong. The defendant testified that she turned back to talk to Thulen, but he exited the Honda and ordered them to get down on the ground before she could do so.

On cross-examination, the prosecutor asked the defendant why she had not told the police after her arrest that she had tried to find out what Rodriguez knew. The defendant said she was arrested and did not know what was going on.

Following deliberations, the jury found the defendant guilty of the offenses charged. She was subsequently sentenced to 12 years of imprisonment and given 139 days of credit for time spent in presentence incarceration. The court also ordered the defendant to pay fines and fees, including a $3,000 drug assessment, a "street-value" fine of $190,680, a $200 lab analysis fee and $20 for the cost of collecting a genetic marker specimen.

## ANALYSIS

First, the defendant argues that the circuit court erred when it denied her motion to suppress evidence. The defendant argues that she was illegally seized, and the illegal seizure tainted the search that resulted in the discovery of the contraband in the cargo area of the vehicle.

■ Courts of review apply a two-part standard of review when faced with a challenge to a circuit court's ruling on a motion to suppress. *People v. Luedemann*, 222 Ill. 2d 530, 857 N.E.2d 187 (2006). First, the circuit court's findings of historical fact are reviewed for clear error, and deference is afforded to any inferences the circuit court drew from those facts. *Luedemann*, 222 Ill. 2d 530, 857 N.E.2d 187. We will not disturb the circuit court's factual findings unless they are against the manifest weight of the evidence. *Luedemann*, 222 Ill. 2d 530, 857 N.E.2d 187. Second, because the reviewing court is free to assess the facts relative to the issue presented in the case, we review the circuit court's ultimate legal ruling on the motion to suppress under the *de novo* standard. *Luedemann*, 222 Ill. 2d 530, 857 N.E.2d 187.

The fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution protect citizens from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6.

■ Initially, we note that the State alleges that the defendant lacks "standing" to contest the search of the vehicle and seizure of the cannabis. However, the question is not one of "standing," as the defendant does not merely assert that her fourth amendment rights were violated by the search of the vehicle and subsequent seizure of the drugs. *Cf. Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978). Rather, the defendant asserts that she was unconstitutionally seized after the conclusion of the traffic stop. She is entitled to challenge the

government action allegedly resulting in a seizure. See, *e.g.*, *Brendlin v. California*, 551 U.S. 249, 168 L. Ed. 2d 132, 127 S. Ct. 2400 (2007). Accordingly, we turn to the merits of the defendant's argument.

■ In its supervisory order, the supreme court directed us to reconsider in light of *Cosby*. In *Cosby*, our supreme court consolidated the criminal cases of Michael Cosby and Hugo Mendoza. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603. Cosby was pulled over for a traffic violation. After obtaining Cosby's information, the officer returned to his squad car and requested backup. The officer returned to Cosby's car after the backup arrived, returned Cosby's information, and gave Cosby a warning. The officer then asked Cosby for consent to search his vehicle. Cosby consented, and the subsequent search revealed drug paraphernalia in the vehicle.

The supreme court emphasized that the traffic stop ended when the officer returned Cosby's information and gave him a warning. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603. Thus, the focus of the court's analysis was on the officer's poststop actions. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603. Because consent to search is valid only if it was voluntarily given (see, *e.g.*, *People v. Terry*, 379 Ill. App. 3d 288, 883 N.E.2d 716 (2008)), the court had to address first whether Cosby had been illegally seized at the time the officer requested consent to search. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603. Applying the principles of *United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), and *People v. Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556 (1999), the court determined that no seizure occurred and that Cosby's consent was therefore voluntarily given. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603.

In Mendoza's case, Officers Wiencek and Weber pulled Mendoza over for traffic violations. After checking Mendoza's information, the officers returned to opposite sides of Mendoza's vehicle. Weber returned Mendoza's information and gave him a verbal warning. Weber then asked for consent to search the vehicle. Mendoza refused. As Weber and Mendoza were talking, Wiencek shined his flashlight in Mendoza's vehicle and observed the end of a gun protruding from beneath the driver's seat. However, Wiencek was unable to communicate the presence of the gun to Weber until after Mendoza drove away. The officers pulled Mendoza over again, made him exit the car, handcuffed him, made him go prone, and found the gun while searching the vehicle.

Noting that the traffic stop ended when Weber returned Mendoza's information and gave him the warning, the supreme court turned to the officer's poststop actions to determine whether a new seizure occurred. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603. Applying *Mendenhall*

and *Brownlee*, the court determined that no seizure occurred at the time the officer requested consent to search and that the subsequent events did not violate Mendoza's fourth amendment rights. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603.

In this case, the traffic stop ended when Thulen returned Cagle's information and issued a warning ticket. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603. Thus, like *Cosby*, our focus is on whether Thulen's post-stop actions constituted a new seizure of the defendant, which is controlled by *Mendenhall* and *Brownlee*.

In *Mendenhall*, the United States Supreme Court held that a person has been seized when an officer restrains that person's movement by physical force or a show of authority. *Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870. Further, the Court held:

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

The factors listed in *Mendenhall* do not constitute an exhaustive list; other coercive police conduct similar to the *Mendenhall* factors may result in a seizure. *Cosby*, 231 Ill. 2d 262, 898 N.E.2d 603.

While the four *Mendenhall* factors are absent from this case, we believe Thulen engaged in coercive conduct similar to the conduct contained in the *Mendenhall* factors. Initially, we note that Thulen's numerous statements to the defendant and the other travelers that they were free to go are not dispositive. *People v. Goeking*, 335 Ill. App. 3d 321, 780 N.E.2d 829 (2002). In fact, Thulen's actions suggested otherwise. After convincing Cagle to wait in the squad car, Thulen ordered the defendant to put her shoes on and exit her vehicle. When the defendant complied, Thulen asked her for consent to search and conduct a canine sniff of the vehicle. The defendant refused. In response, Thulen told the defendant and the other travelers that they were free to go, but he was detaining the vehicle until he could perform the canine sniff. Thulen told them they could walk away, hop the fence, or have Thulen call someone for a ride. However, these were not viable options for people traveling on an interstate highway between Colorado and Michigan. We hold that a reasonable person in this situation would not have felt free to leave. See *Mendenhall*, 446 U.S. 544,

64 L. Ed. 2d 497, 100 S. Ct. 1870; *Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556. Inasmuch as the defendant was an out-of-state traveler on an interstate highway with no mode of transportation, Thulen's show of authority subjected the defendant to a seizure. *Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870; *Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556.

An individual may not be lawfully seized without reasonable, objective grounds to support the seizure. *Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556. Without probable cause, the seizure must be supported by "a reasonable suspicion based upon specific and articulable facts that the person has committed, or is about to commit, a crime." *Brownlee*, 186 Ill. 2d at 518, 713 N.E.2d at 565; *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). In this case, Thulen's suspicion was based on the following: (1) the vehicle was traveling from Colorado on Interstate 80 in Illinois, which raised Thulen's suspicions because Colorado was a hub for drug distribution and Interstate 80 was a main corridor for drug traffic; (2) the travelers were allegedly very nervous, including Cagle's allegedly suspicious response when asked if there was anything illegal in the vehicle and her reaction to hearing her criminal history over Thulen's radio; and (3) the vehicle's "significant reaction" of slowing down considerably when it initially passed Thulen. While Thulen also noted Rodriguez's furtive movement when he initially approached the vehicle, he stated that he immediately investigated the movement and dispelled his suspicion. Although courts give "due weight" to factual inferences drawn by law enforcement, the weight to be drawn is based on the circumstances of the case. *United States v. Arvizu*, 534 U.S. 266, 151 L. Ed. 2d 740, 122 S. Ct. 744 (2002).

Thus, we are called upon to decide, on the facts of this case, whether Thulen's testimony satisfies the requirement of reasonable, articulable suspicion, and is not based on the boundless discretion of a "hunch." The decision rests upon the difference between objective, particularized reasonable suspicion versus subjective, generalized hunches. Courts have sometimes found it reasonable for an officer to suspect an individual or individuals when they were traveling to or from areas notorious for drugs. See, *e.g.*, *Arvizu*, 534 U.S. 266, 151 L. Ed. 2d 740, 122 S. Ct. 744 (traveling from a town notorious for drug smuggling); *United States v. Sokolow*, 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989) (making a short trip to a city notorious for being a source of illegal drugs). Being nervous is sometimes said to be of limited significance in establishing a reasonable suspicion (see *Brent v. Ashley*, 247 F.3d 1294 (11th Cir. 2001); *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998); *United States v. Fernandez*, 18 F.3d 874 (10th Cir.

1994)), but sometimes reasonable (see *United States v. Hunnicutt*, 135 F.3d 1345 (10th Cir. 1998); *United States v. Bloomfield*, 40 F.3d 910 (8th Cir. 1994); *United States v. McCarthur*, 6 F.3d 1270 (7th Cir. 1993)). Certain responses to the presence of police have been found to support a finding of reasonable suspicion (see, *e.g.*, *United States v. Carr*, 296 Fed. Appx. 912 (11th Cir. 2008)), but sometimes do not support such a finding (see *United States v. Diaz*, 977 F.2d 163 (5th Cir. 1992)). Furtive gestures have been given weight in finding reasonable suspicion (see *United States v. Nash*, 876 F.2d 1359 (7th Cir. 1989)), and not given weight (see *United States v. McKoy*, 402 F. Supp. 2d 311 (D. Mass. 2004), *aff'd*, 428 F.3d 38 (1st Cir. 2005)). Our decision, however, must take into account the totality of the circumstances. See *Sokolow*, 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581; *United States v. Cortez*, 449 U.S. 411, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981); see also *Arvizu*, 534 U.S. 266, 151 L. Ed. 2d 740, 122 S. Ct. 744; *United States v. Benitez-Macedo*, 129 Fed. Appx. 506 (11th Cir. 2005).

Under the totality of the circumstances in this case, given the fact that Thulen told the travelers that they were free to go and only issued a warning ticket to the driver, the facts of this case indicate nothing more than a hunch and not reasonable, objective grounds to support the seizure. The facts merely indicate a Colorado vehicle slowed down as it passed a police officer on Interstate 80 in Illinois, and the vehicle's occupants were nervous after the vehicle was stopped, including the driver who allegedly got more nervous when her criminal history was broadcast over the officer's radio. "Mere hunches and unparticularized suspicions" do not rise to the level of a reasonable, articulable suspicion of criminal activity. *People v. Ruffin*, 315 Ill. App. 3d 744, 748, 734 N.E.2d 507, 511 (2000); see also *Terry*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *Arvizu*, 534 U.S. 266, 151 L. Ed. 2d 740, 122 S. Ct. 744; *Illinois v. Wardlow*, 528 U.S. 119, 145 L. Ed. 2d 570, 120 S. Ct. 673 (2000); *Maryland v. Buie*, 494 U.S. 325, 108 L. Ed. 2d 276, 110 S. Ct. 1093 (1990); *Sokolow*, 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581; *New Jersey v. T.L.O.*, 469 U.S. 325, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985); *United States v. Montoya de Hernandez*, 473 U.S. 531, 87 L. Ed. 2d 381, 105 S. Ct. 3304 (1985); *Reid v. Georgia*, 448 U.S. 438, 65 L. Ed. 2d 890, 100 S. Ct. 2752 (1980); *Delaware v. Prouse*, 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979); *Wilkes v. Wood*, 98 Eng. Rep. 489 (1763) (even prior to the American Revolution and Bill of Rights, discretionary power of law enforcement based only on suspicions was subversive of the liberty of the suspected individuals). Under these circumstances, we hold that Thulen's seizure of the defendant was unlawful. See *Brownlee*, 186 Ill. 2d 501, 713 N.E.2d 556.

Lastly, we recognize that not all evidence that is obtained after an illegal seizure is necessarily subject to suppression. *Wong Sun v. United States*, 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417 (1963) (the question is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)"). However, it is clear that the search of the defendant's vehicle and subsequent seizure of the drugs flowed from the illegal seizure of the defendant. Accordingly, the evidence seized in this case was tainted and should have been suppressed. See *Wong Sun*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407. Therefore, we hold that the circuit court erred when it denied the defendant's motion to suppress.

The judgment of the circuit court of Henry County is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

WRIGHT, J., concurs.

JUSTICE SCHMIDT, dissenting:

I agree that the defendant was seized at the time of the search, notwithstanding the trooper's statement that she was free to go. Where was she going to go? That being said, it is my opinion that the brief detention was supported by a reasonable, articulable suspicion. That is, this probable cause traffic stop evolved into a permissible *Terry* stop. In fact, the cases cited by the majority (392 Ill. App. 3d at 27-28) support this proposition. The second seizure was brief. The trooper had the dog in his squad car. He did not have to wait for the dog to arrive. As pointed out, the fourth amendment protects against unreasonable searches and seizures. Under the totality of the circumstances, there is nothing unreasonable about this brief seizure.

While talking to the driver of the vehicle, the trooper learned that the group was traveling from Colorado to Michigan. Based on his training, the trooper knew that Colorado was a hub for the distribution of illegal drugs and that substantial amounts of cocaine and marijuana were transported from there using Interstate 80 as a main corridor.

Furthermore, while writing the warning ticket, a message was radioed to the trooper informing him that the driver had prior arrests for numerous offenses, including possession of controlled substances. Although being informed that she was only going to receive a warning

ticket, when the driver overheard her criminal history relayed to the trooper, her nervousness heightened and her lips began to tremble. The driver also became evasive in that she would no longer look at the trooper after realizing he knew her criminal past.

After observing this behavior, the trooper asked the driver if there was anything illegal in the car. The driver stated, "Not that I know of." Given his knowledge and training, together with his observations of the occupants of the vehicle, the trooper suspected that the vehicle contained contraband. After being denied permission to search, the trooper informed the occupants that he was going to execute a canine sniff of the vehicle.

The majority acknowledges that courts have found it reasonable for a police officer to consider the fact that an individual is traveling to or from an area notorious for drug trafficking activities and that nervousness has been acknowledged to be significant when establishing a reasonable suspicion. 392 Ill. App. 3d at 27-28. The majority would, undoubtedly, also acknowledge that evasiveness has been recognized as a factor to consider when determining the existence of a reasonable articulable suspicion. *United States v. Brignoni-Ponce*, 422 U.S. 873, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975). The driver was evasive by turning away from the trooper to avoid eye contact once she knew the trooper was aware of her criminal history. She also became more nervous. Noticing this evasiveness, the trooper asked if there was anything illegal in the car and the driver continued her evasiveness by providing an ambiguous answer to the question. However, when viewing the totality of the circumstances, the majority finds that the trooper did not have a reasonable, articulable suspicion of criminal activity.

As the United States Supreme Court has noted many times, the process of determining what is and is not a reasonable, articulable suspicion "does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers." *United States v. Cortez*, 449 U.S. 411, 418, 66 L. Ed. 2d 621, 629, 101 S. Ct. 690, 695 (1981); see also *United States v. Sokolow*, 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989). As the United States Supreme Court stated in *Sokolow*:

> "We noted in *Gates* [citation], that 'innocent behavior will frequently provide the basis for a showing of probable cause,' and that '[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of

noncriminal acts.' That principle applies equally well to the reasonable suspicion inquiry." *Sokolow*, 490 U.S. at 10, 104 L. Ed. 2d at 12, 109 S. Ct. at 1587.

The majority inaccurately describes this encounter as one in which the trooper failed to articulate the basis for a reasonable suspicion of criminal activity. Nervousness, evasiveness, a past criminal history, and traveling from an area known as a major narcotics hub down a known narcotics thoroughfare have all been recognized as factors to be considered when forming a reasonable, articulable suspicion. It is not unreasonable to expect that many people will exhibit some level of nervousness when stopped by a police officer. Key here is the fact that the driver was told she was getting a written warning. Common sense tells us that this news should have caused the normal anxiety to at least subside somewhat. But when defendant heard the radio transmission regarding her criminal history, her nervousness visibly increased. It is reasonable to presume that this was because she felt the trooper was now more likely to want to search her vehicle.

Because I find that the trooper had a reasonable, articulable suspicion of criminal activity to support the brief seizure necessary to conduct the dog sniff, I would affirm.