928 N.E.2d 288 (2010)
W.H., Appellant-Defendant,
v.
STATE of Indiana, Appellee-Plaintiff.
No. 49A02-0912-JV-1166.
Court of Appeals of Indiana.
June 17, 2010.
*290 Joel M. Schumm, Indianapolis, IN, Attorney for Appellant.
Gregory F. Zoeller, Attorney General of Indiana, Karl M. Scharnberg, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

OPINION
VAIDIK, Judge.

Case Summary
W.H. appeals his juvenile delinquency adjudication for Class A misdemeanor carrying a handgun without a license. W.H. was standing on a street corner during an outdoor summer convention. He lifted his shirt and showed something in his waistband to a person nearby. Uniformed police officers approached W.H. and asked him to come with them. The officers ultimately searched W.H. and discovered a handgun in his pants pocket. At his delinquency fact-finding hearing, W.H. moved to suppress the State's evidence as the product of an unconstitutional search and seizure. The juvenile court denied the motion. We find that W.H.'s detention was supported by reasonable suspicion and did not offend his federal constitutional rights. We also hold that the stop did not violate W.H.'s state constitutional protections, as the level of suspicion and extent of law enforcement needs outweighed the degree of intrusion. We conclude that the State's evidence was properly admitted and affirm the judgment of the juvenile court.

Facts and Procedural History
On July 18, 2009, members of the Indianapolis Metropolitan Police Department were on duty at the Indiana Black Expo. The Black Expo is a summer celebration which takes place in downtown Indianapolis. Police officers called "spotters" were positioned inside buildings to observe crowds from above. Officers Rick Jones and Brycen Garner were outside, standing at the intersection of Maryland Street and Capitol Avenue. They were in full police uniform.
One of the spotters radioed that a subject was on the corner, "making hand[] movements towards his waist," "lifting up his shirt," and "showing something from his waistband to another person." Tr. p. 4, 17. The subject was a black male wearing a white shirt with red stripes and black jeans or shorts.
Officers Jones and Garner received the transmission and headed into the crowd. There were fifty to one hundred people in the vicinity. Officer Jones suspected that the subject was carrying a firearm. He was concerned for his own safety and the safety of those around him. The officers walked toward a suspect who matched the radioed description. The suspect was later identified as fifteen-year-old W.H.
Officer Garner approached W.H. and told him to "come with me." Id. at 30. Officer Garner would testify that W.H. "was not free to leave" and "was being detained" based on the radio report. Id. at 36. W.H. looked at Officer Jones and took a couple steps toward him, "following the other officer's direction." Id. at 8. W.H. then turned away and placed his left hand inside his left front pants pocket. Officer Jones grabbed W.H. by his left elbow and wrist. W.H. "began to have happy feet" and tried to resist, id. at 21, at which time Officer Jones took hold of W.H.'s other arm. The officers brought W.H. toward a police car parked roughly ten feet away.
Officer Garner asked W.H. if he had any weapons on him. W.H. said he did not. Officer Garner noticed a bulge on W.H.'s right side underneath his shirt. He lifted W.H.'s shirt and discovered a handgun sticking out of his pocket. Officer Garner *291 grabbed the firearm and alerted other officers. The gun was a loaded .9 millimeter semi-automatic pistol for which W.H. did not have a license. The officers cuffed W.H. and took him into custody.
The State charged W.H. with, among other things, Class A misdemeanor carrying a handgun without a license, Ind.Code § 35-47-2-1, and Class A misdemeanor dangerous possession of a firearm, id. § 35-47-10-5.
The State called Officers Jones and Garner to testify at W.H.'s delinquency fact-finding hearing. The State also offered W.H.'s handgun into evidence.
W.H. moved to suppress the State's evidence as the product of an unconstitutional search and seizure. The parties argued the motion throughout the fact-finding hearing. W.H. directed the juvenile court's attention to Stalling v. State, 713 N.E.2d 922 (Ind.Ct.App.1999), to support his contention that the search was unlawful. In Stalling, police stopped and searched the defendant on the street after seeing him "move as if to place something into the waistband of his pants near the belt buckle." Id. at 923. A panel of this Court found the stop was not supported by reasonable suspicion and was therefore unconstitutional. Id. at 925. The juvenile court discussed the facts of Stalling but concluded they were "different than what we have here." Tr. p. 20. The court denied W.H.'s suppression motion and admitted the State's evidence over objection.
The court merged the weapons charges and entered a true finding on Class A misdemeanor carrying a handgun without a license.
After the juvenile court entered its findings, W.H.'s father sought permission to address the court. W.H.'s father was concerned about the propriety of the police officers' conduct. The following colloquy ensued:
[FATHER]: I was reading the motion myself and a part of what I read and what I heard the officer say, that the description that they gave of my son. I mean it could've been several people down there to fit the description. Did anybody else fit the description like that?
THE COURT: ... [L]et me ask you this, did your son have a gun on that day?
[FATHER]: Did my son have a gun on that day?
THE COURT: Yeah.
[FATHER]: I have no idea. I have absolutely no idea.
THE COURT: The officer plant it?
[FATHER]: No sir.
THE COURT: Okay.
[FATHER]: Do I believe my son had a gun on him? Yes, sir, I absolutely do.
THE COURT: Okay. Let me ask you this ...
[FATHER]: I absolutely do.
THE COURT: From one parent to another. It would seem to me that would be the primary concern. Lesser what the police ... Lesser what the police did. As a parent.
[FATHER]: Yes, sir.
THE COURT: I mean, as a lawyer, obviously more concerned about the rights.
[FATHER]: Right.
THE COURT: But as a parent, why is your son down at Black Expo with a loaded gun?
[FATHER]: Your Honor, I am truly, truly concerned about it. That's my number 1 concern.
THE COURT: Really?

*292 [FATHER]: That my son ... That my son ... The officer arrested my son and took the gun from my son ...
THE COURT: Yeah.
[FATHER]: ... Before my son could've got himself in some serious trouble.
THE COURT: Yeah.
[FATHER]: That is my concern. But my concern also is ...
THE COURT: If your son would've done something stupid, this officer would've killed him.
[FATHER]: Yes, sir.
THE COURT: We would've been having a totally different conversation.
[FATHER]: Yes, sir.
THE COURT: ... I'll talk with [defense counsel] about rights and constitutional obligations and so. I can't have that conversation with you .... You know, I'm just not there as a, as a father and as a parent, I can't have that conversation with you when [your] child's out at expo with a loaded gun.
[FATHER]: Yes, Your Honor, I understand. This is not the conversation that I really (inaudible) I just used that to, to approach you with the conversation ...
THE COURT: Yeah.
[FATHER]: Here I am ... I'm concerned about the law. And I know if they had been at a (inaudible) concert and they had seen a bunch of people, white guys on the corner, it would've been a totally different situation.
THE COURT: Apples and oranges. Because we're not there. You know, we're talking about Black Expo and your son. I can't ... I don't know what went on during Brickyard. I don't know what went on during Indy 500 or when the Grand Prix, I don't know about that. All I know is on this day, your son was downtown with a loaded gun. And put himself at risk and everybody else.
[FATHER]: I agree.
THE COURT: Cause if these officers had been, had been inexperienced officers and were jumpy, how many stories have you read about young black males not making it ... Not making it alive when they get into police custody? Come on now. Come on dad, real talk.
[FATHER]: Okay, listen to me.... How many blacks do you know have been accused of things they didn't do, they end up going to jail for something they didn't do, just because the officer decided you know ...
THE COURT: Did your son have a gun?
[FATHER]: I'm so embarrassed.
THE COURT: ... That's a totally different conversation.
[FATHER]: He had a gun. Your Honor, my son had a gun.
THE COURT: ... Lets not talk about false accusations cause this is ... This is not a situation about false accusations. Your son in fact had a gun.
[FATHER]: Yes, sir.
THE COURT: Now we can ... We can agree to disagree about what police ... Whether or not police observed the constitutional law and so forth. We can ... That's not, you know, we can discuss that. Your son had a gun.
[FATHER]: Yes, sir. No doubt about it.
THE COURT: Okay. So it's not about false accusation. It's not ... I mean this isn't the Scottsboro[] trials....
Id. at 43-46.
W.H. now appeals.

Discussion and Decision
W.H. raises three issues which we reorder and restate as follows: (1) whether, in light of the juvenile court's statements to W.H.'s father, we should remand *293 the case so that the juvenile court can articulate or clarify the basis of its ruling on the suppression motion, (2) whether the police officers' search and seizure violated W.H.'s rights under the Fourteenth Amendment to the United States Constitution, and (3) whether the search and seizure violated his rights under Article 1, Section 11 of the Indiana Constitution.

I. The Juvenile Court's Comments to W.H.'s Father
W.H. argues that "the juvenile court offered no explanation for the constitutional basis of its [suppression] ruling but instead chastised Respondent's father at length for his son having a gun." Appellant's Br. 10. W.H. requests that we remand the case so that the juvenile court can "explain its reasons, grounded in the constitution and not parenting, for denying the motion to suppress." Id. at 12.
We first observe that a trial court need not enter findings of fact and conclusions of law in connection with a motion to suppress evidence. Indiana Trial Rule 52(A) provides that "[f]indings of fact are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(B) (dismissal) and 59(J) (motion to correct errors)." Our appellate courts routinely review suppression rulings without the benefit of express findings and conclusions. See, e.g., State v. Estep, 753 N.E.2d 22, 25 n.6 (Ind.Ct.App. 2001). It is therefore unnecessary that we remand the case so that the juvenile court can explain its reasons for denying the suppression motion.
Moreover, the record reflects that the juvenile court properly based its ruling on the constitutionality of the officers' search. The juvenile court discussed specific stop-and-frisk case law with defense counsel before reaching its decision. It distinguished Stalling v. State, 713 N.E.2d 922 (Ind.Ct.App.1999), in which a panel of this Court found a detention unconstitutional. We thus disagree with W.H. that the juvenile court offered "no explanation for the constitutional basis of its ruling."
W.H. cites Kribs v. State, 917 N.E.2d 1249 (Ind.Ct.App.2009), in support of his request for remand. In Kribs, the defendant checked in for a flight at the Indianapolis International Airport with a loaded handgun in his jacket pocket. Id. at 1250. He told police that he had placed the gun inside his jacket that morning without realizing it and had forgotten it was there when he entered the airport. Id. The State charged Kribs with entering a controlled area of an airport with a weapon or explosive. Id. Kribs was tried to the bench. Id. The trial court found him guilty as charged. Id. But at Kribs' sentencing hearing, the court stated on the record:
I think that it may very well be in this case where [Kribs] did not understand, or he didn't remember because [the handgun is] such a part of his equipment, his life, his being every day, that he puts on just like he puts on his tie or his socks or something. I don't think there was malicious intent. But at the same time, I think that would always be a way to escape any culpability, and I don't think that the law permits that.
Id. Kribs appealed, arguing there was insufficient evidence to sustain his conviction. Id. This Court agreed and reversed. Id. at 1251. We noted that the State produced sufficient evidence to sustain the guilty verdict and that, had the trial court remained silent, we would likely have affirmed. Id. However, the trial court's express belief that Kribs "didn't remember" having the handgun and did not have "malicious intent" reflected a finding by the court that Kribs was unaware he had the gun in his possession when he entered the airport. Id. The State therefore failed to *294 prove beyond a reasonable doubt that Kribs knowingly or intentionally possessed a handgun at the time of the events in question. Id.
The situation before us is unlike that presented in Kribs. In Kribs, the trial court's comments constituted factual findings which precluded a guilty verdict. The court's statements indicated that the State failed to prove the necessary culpability requirements for the offense charged. Consequently, there was insufficient evidence to sustain Kribs' conviction and reversal was required. Here, by contrast, the juvenile court's remarks to W.H.'s father do not preclude or otherwise affect the ruling on W.H.'s motion to suppress. The juvenile court simply admonished W.H.'s father for permitting W.H. to attend the Black Expo with a loaded gun. These comments were irrelevant to the determination of reasonable suspicion and the constitutionality of the police officers' stop-and-frisk. The Kribs outcome is therefore inapposite.
For the foregoing reasons, we see no reason to remand the case and instead proceed to the merits of W.H.'s claim.

II. Fourth Amendment
W.H. argues that the State's evidence was seized and introduced in violation of his rights under the Fourth Amendment. He contends that law enforcement lacked reasonable suspicion to stop him, and any evidence obtained as a result of the detention should have been suppressed by the juvenile court.
The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment is made applicable to the States via the Due Process Clause of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Evidence obtained in violation of a defendant's Fourth Amendment rights may not be introduced against him at trial. Id. at 648-60, 81 S.Ct. 1684.
The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its safeguards extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). However, a police officer may briefly detain a person for investigatory purposes without a warrant or probable cause if, based upon specific and articulable facts together with rational inferences from those facts, the official intrusion is reasonably warranted and the officer has a reasonable suspicion that criminal activity "may be afoot." Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
Reasonable suspicion exists where the facts known to the detaining officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has or is about to occur. Campos v. State, 885 N.E.2d 590, 597 (Ind.2008). When making a reasonable suspicion determination, reviewing courts examine the "totality of the circumstances" of the case to see whether the officer had a "particularized and objective basis" for suspecting legal wrongdoing. Arvizu, 534 U.S. at 273, 122 S.Ct. 744. Officers are not required to rule out all possibility of innocent behavior before initiating a stop. United States v. Holland, *295 510 F.2d 453, 455 (9th Cir.1975). "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct." 4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.5(b) (4th ed. 2004) (quoting In re Tony C., 21 Cal.3d 888, 148 Cal.Rptr. 366, 582 P.2d 957, 960 (1978)). In addition, courts do take into account the nature of the suspected offense when assessing reasonable suspicion, and they have "required less evidence when the stop is to intercept a man suspected of being armed with a gun." Id. § 9.5(c) n. 96, see also id. § 9.5(h) ("Certainly a stopping for investigation will be the least intrusive effective means of dealing with certain special situations, such as a major bomb scare or the kidnapping of a child, and thus there is good reason to acknowledge that lesser evidence than is otherwise required may be used in such situations even if the same variable probable cause concept is not accepted with respect to custodial arrests and full searches.").
Here Officers Jones and Garner were alerted by a police spotter that a subject fitting W.H.'s description was "making hand[] movements towards his waist," "lifting up his shirt," and "showing something from his waistband to another person." We believe this information furnished the officers with a particularized and objective basis for suspecting that W.H. had an illegal weapon on his person. The officers could reasonably suspect that a subject displaying something in his waistband was in fact holstering a firearm, and that he was doing so illegally. See People v. Benjamin, 51 N.Y.2d 267, 434 N.Y.S.2d 144, 414 N.E.2d 645, 648 (1980) ("It is quite apparent to an experienced police officer, and indeed it may almost be considered common knowledge, that a handgun is often carried in the waistband."). W.H. maintains that "[a] person could lift his shirt to show someone a belt buckle, cell phone, or as the juvenile court suggested, his abs of steel.'" Appellant's Br. p. 7 (citing Tr. p. 20). But Officers Jones and Garner were not required to rule out all possible innocent explanations when evaluating the conduct observed. Moreover, if the suspect were showing someone only a wallet or cell phone, for example, he would presumably remove the wallet or cell phone from his pants and hand it to the person. A subject carrying a firearm, on the other hand, would likely prefer to keep the weapon concealed on his body, as did the subject in this case. Finally, there were upwards of one hundred people in the area, the police officers were monitoring the crowds for public safety reasons, and the suspected offense was illegal possession of a firearm. We conclude that, based on the totality of these circumstances, the officers' stop was justified by reasonable suspicion and did not violate W.H.'s Fourth Amendment rights.
W.H. relies on this Court's opinions in Stalling v. State, 713 N.E.2d 922 (Ind.Ct. App.1999), and Williams v. State, 745 N.E.2d 241 (Ind.Ct.App.2001), to support his argument that law enforcement lacked reasonable suspicion.
In Stalling, three police officers saw a suspected truant standing with a group of people in a high crime neighborhood. 713 N.E.2d at 923. Stalling was among the group. Id. The officers parked their cruiser to speak with the truant. Id. He fled on his bicycle, and the rest of the group dispersed. Id. One of the police officers recognized Stalling as the target of a prior, unsuccessful narcotics investigation. Id. The officer observed Stalling "move as if to place something into the waistband of his pants near the belt buckle." Id. The officer confronted him and asked what he had just placed in his waistband. Id. at 923-24. Stalling did not respond. Id. at *296 924. The officer conducted a pat-down search and discovered a bag containing cocaine tucked inside Stalling's pants. Id. Stalling was charged with possession of cocaine and moved to suppress the seized drugs. Id. The trial court denied the motion, but a panel of this Court reversed. Id. at 925. The Stalling panel found that the foregoing factors were insufficient to establish reasonable suspicion justifying the stop and search. Id. at 924-25.
In Williams, a police officer saw the defendant and an associate talking on the corner. 745 N.E.2d at 243. The officer observed them "making some type of hand to hand exchange," though he could not identify what they were passing. Id. The associate looked over her shoulder and saw the police officer. Id. She and Williams then walked away in separate directions. Id. The officer instructed them to stop. Id. He searched Williams and found both a knife and plastic bag containing cocaine. Id. Williams argued that the officer did not have reasonable suspicion to conduct a stop and that the evidence should have been suppressed. Id. A panel of this Court agreed. Id. at 245. The Williams panel concluded that the exchange of an unidentifiable item, along with the act of walking away, failed to establish reasonable suspicion. Id.; see also Webb v. State, 714 N.E.2d 787, 788-89 (Ind.Ct.App. 1999) (finding no reasonable suspicion where defendant "turned his body away" and appeared to "put[] something down his pants" after seeing police officer).
We believe the case before us is distinguishable on its facts. First, the behavior observed by law enforcement in this case was markedly different than that observed by the police in Stalling and Williams. The police spotter radioed that a subject was "showing something from his waistband to another person." We find this act of display, along with the location of the display on the suspect's person, were critical and supplied a specific, reasonable belief that the suspect was carrying a gun. Also, unlike in Stalling and Williams, there were between fifty and one hundred people in the vicinity, and W.H. was suspected to be carrying a dangerous weapon. These circumstances further supported the reasonableness of the detention.
We conclude that the stop did not violate W.H.'s Fourth Amendment rights.

III. Article 1, Section 11
W.H. argues in the alternative that the detention violated his protections under Article 1, Section 11 of the Indiana Constitution.
Article 1, Section 11 provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." Although Article 1, Section 11 tracks the Fourth Amendment verbatim, we proceed somewhat differently when analyzing the language under the Indiana Constitution than when considering the same language under the United States Constitution. Redden v. State, 850 N.E.2d 451, 460 (Ind. Ct.App.2006). Our analysis of reasonableness under Article 1, Section 11 turns on "(1) the degree of concern, suspicion, or knowledge that a violation had occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement needs." Litchfield v. State, 824 N.E.2d 356, 361 (Ind.2005). Article 1, Section 11 in some cases confers greater protections to individual rights than the Fourth Amendment affords. Holder v. State, 847 N.E.2d 930, 940 (Ind. 2006); Litchfield, 824 N.E.2d at 358-59; *297 Mitchell v. State, 745 N.E.2d 775, 786 (Ind. 2001). But "we have previously `adopted the Terry rationale in determining the legality of investigatory stops under Article 1, § 11 of the Indiana Constitution.'" Carter v. State, 692 N.E.2d 464, 466 (Ind. Ct.App.1997) (quoting Wilson v. State, 670 N.E.2d 27, 29 (Ind.Ct.App.1996)).
Here Officers Jones and Garner were on duty at a crowded, outdoor summer convention. They received information over the police radio that a subject was showing something from his waistband to another person. The officers were concerned that the subject was carrying a firearm. There were fifty to one hundred people in the area. The officers approached W.H. and told him to come with them. We find that, based on (1) the degree of suspicion and concern that W.H. had a firearm on his person, (2) the brevity and unintrusive character of the stop, and (3) the need for law enforcement to maintain safety at a crowded city convention, the police officers did not act unreasonably. We conclude that W.H.'s detention did not run afoul of his state constitutional rights.
For the reasons stated, we find that W.H.'s stop-and-frisk was not unconstitutional, and the evidence obtained as a result thereof was properly admitted at his delinquency fact-finding hearing. We affirm the judgment of the juvenile court.
Affirmed.
NAJAM, J., and BROWN, J., concur.