*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CM-1102

EDWARD MORGAN, JR., APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-11110-13)

(Hon. J. Michael Ryan, Trial Judge)

(Argued December 9, 2014      Decided August 6, 2015)

*Stephanie L. Johnson* for appellant.

*Stephen F. Rickard*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Lindsey Merikas*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON, EASTERLY, and MCLEESE, *Associate Judges*.

Opinion for the court by *Associate Judge* MCLEESE.

Dissenting opinion by *Associate Judge* EASTERLY at page 14.

MCLEESE, *Associate Judge*: Appellant Edward Morgan, Jr. challenges his conviction for possession of cocaine. Mr. Morgan argues that the trial court erroneously denied his motion to suppress evidence. We affirm.

## I.

The United States's evidence at the suppression hearing indicated the following. On June 29, 2013, at approximately 9:00 p.m., a citizen called the police to report potential drug crimes occurring near the citizen's residence. A fellow officer communicated the citizen's contact information and location to Sergeant James Boteler and Officer Derek Tarr, who went to the citizen's apartment building and spoke with the citizen. The citizen, who worked for the Department of Homeland Security, told the officers that the citizen on more than one occasion had seen what the citizen believed to be hand-to-hand drug transactions near the citizen's apartment. The citizen further explained that, a few minutes before calling the police, the citizen saw a man on a bicycle exchange small objects with another man, after which the two parted ways. During the exchange, the man on the bicycle "reach[ed] into the back of [his] pants and pull[ed] something out [and] put it back in." The citizen described the man as a short black male with dreadlocks, riding a red bicycle. The citizen also described

the color of the man's shirt; Sergeant Boteler at various points indicated that the citizen described the man's shirt as "blue gray," "purplish gray, or purple slash gray," or "purple and grayish."

The officers drove around the area looking for the suspect. About ten to fifteen minutes later, the citizen called Sergeant Boteler and said that the man on the bicycle was in the 1500 block of P Street, NW. Within about thirty seconds, the officers arrived at that location and saw Mr. Morgan, who was riding a red bicycle and matched the description of the suspect. The officers got out of their car, and Sergeant Boteler asked Mr. Morgan if they could talk to him for a second. Sergeant Boteler told Mr. Morgan that he matched the description of someone who may have been involved in a drug transaction and asked Mr. Morgan if he had any illegal drugs on him. Mr. Morgan denied that he did but said that he did have "some K-2 stuff." Sergeant Boteler knew that "K-2" is a common term for synthetic cannabinoids and that possession of certain synthetic cannabinoids has been illegal under federal law since 2012. Mr. Morgan told Sergeant Boteler that Sergeant Boteler could search him but that he did not have anything on him.

One of the officers took the K-2 out of Mr. Morgan's pocket. Sergeant Boteler ran his hands around Mr. Morgan's waistband and felt an object below Mr.

Morgan's waistband, underneath the back of the pants. At this point, one of the officers handcuffed Mr. Morgan. After officers tried to persuade Mr. Morgan to remove the drugs from his person, Mr. Morgan reached into the back of his pants, took out a substantial amount of crack cocaine, and dropped it on the ground.

Mr. Morgan called his wife as a witness at the suppression hearing. She testified that on the date of the arrest she saw Mr. Morgan sitting in a police car, wearing a blue t-shirt and a hat.

At the close of the suppression hearing, Mr. Morgan argued that all of the evidence should be suppressed, because the officers unlawfully stopped him in violation of the Fourth Amendment. Concluding that the stop was justified by reasonable articulable suspicion, the trial court denied the motion to suppress. The trial court then found Mr. Morgan guilty after a stipulated trial.

## II.

Mr. Morgan argues that the trial court erred in finding that the officers had reasonable articulable suspicion to conduct a *Terry* stop. *See Terry v. Ohio*, 392

U.S. 1, 30 (1968) (officers may conduct investigatory stop if they reasonably believe "criminal activity may be afoot"). We conclude otherwise.

## A.

When reviewing a trial court's denial of a motion to suppress, we "must view the evidence in the light most favorable to the prevailing party." *Bennett v. United States*, 26 A.3d 745, 751 (D.C. 2011) (internal quotation marks omitted). We draw all reasonable inferences in favor of upholding the trial court's ruling. *Milline v. United States*, 856 A.2d 616, 618 (D.C. 2004). "The police may briefly detain a person for an investigatory or *Terry* stop . . . if the officers have a reasonable suspicion based on specific and articulable facts that criminal activity may be occurring." *Pinkney v. United States*, 851 A.2d 479, 493 (D.C. 2004) (internal quotation marks omitted). "'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . . ." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see also, e.g.*, *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 217 (1984) (investigative detention requires "some minimal level of objective justification"); *Robinson v. United States*, 76 A.3d 329, 336 (D.C. 2013) ("The reasonable, articulable suspicion standard requires substantially less than probable

cause and considerably less than proof of wrongdoing by a preponderance of the evidence. It is not onerous, but it is not toothless either. ... Unparticularized suspicion and inarticulate hunches are not sufficient to sustain a *Terry* stop . . . .") (citations and internal quotation marks omitted).

**B.**

We conclude that the information provided by the citizen provided the officers with reasonable articulable suspicion to conduct a *Terry* stop. We note at the outset that although the citizen was not named at the suppression hearing, the citizen provided contact information and spoke to the police in person. The citizen thus was an adequately reliable source of information. *See, e.g.*, *Joseph v. United States*, 926 A.2d 1156, 1161 (D.C. 2007) ("[I]nformation from an identified citizen is presumptively reliable.").

**1.**

We conclude that the information provided by the citizen gave rise to a reasonable belief that the suspect was involved in unlawful activity. In reaching this conclusion, we rely on the citizen's statement that the suspect "reach[ed] into

the back of [his] pants and pull[ed] something out [and] put it back in" during the exchange of small objects with another man. Interpreted naturally, that statement indicated that the suspect had reached inside the rear of the suspect's waistband. *See, e.g.*, *United States v. Scott*, 987 A.2d 1180, 1185-86 (D.C. 2010) (interchangeably referring to "reaching into the back of his pants," reaching into his pants, and reaching "into the waistband of his pants") (internal quotation marks omitted); *Mothersell v. Syracuse*, 289 F.R.D. 389, 398-99 (N.D.N.Y. 2013) (equating attempt to "reach down into the back of his pants" and "attempt to stick his fingers inside the waistband of his pants and underwear"); *Donaldson v. State*, 7 A.3d 84, 87, 93 (Md. 2010) (where officer described suspect as pulling plastic bag "from the rear of his pants," court concludes that "keeping the items in a plastic bag in the rear of his pants was undoubtedly suspicious"). Although it is in theory possible that the citizen meant only to indicate that the suspect reached into a back pocket, rather than inside the waistband of the suspect's pants, that does not seem to be the more natural interpretation of the citizen's words. In any event, the Fourth Amendment requires only that the police have a reasonable basis for their actions, and we conclude that it would be objectively reasonable to understand the citizen's statement as indicating that the suspect obtained an object from inside the waistband of his pants and then returned an object to the same location. *Cf., e.g.*, *United States v. Fury*, 554 F.2d 522, 530-31 (2d Cir. 1977) ("The conversations,

while somewhat ambiguous at times, can be reasonably interpreted to indicate what the detective interpreted them to be.").  In arguing to the contrary, the dissent suggests that ambiguity is fatal to reasonable articulable suspicion.  *Infra* p. 21. The law is otherwise.  *See, e.g.*, *Wardlow*, 528 U.S. at 125 ("Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. . . .  *Terry* recognized that the officers could detain the individuals to resolve the ambiguity."); *Umanzor v. United States*, 803 A.2d 983, 993 (D.C. 2002) ("[T]he *Terry* standard does not require that an officer rule out the possibility of innocent behavior, for suspicious conduct by its very nature is ambiguous, and the principal function of the investigative stop is to quickly resolve that ambiguity[.]") (internal quotation marks omitted).

We further conclude that a person's removal and replacement of an object from inside the waistband of the back of his pants during an exchange will typically create reasonable articulable suspicion to believe that the suspect was involved in criminal wrongdoing.  In the circumstances of this case, we see no plausible, innocent explanation for such conduct.  To the contrary, we view such conduct as comparable to storing objects in the crotch area, which we have described as "a uniquely private part of the body not normally used for carrying lawfully-held personal effects . . . ."  *Jefferson v. United States*, 906 A.2d 885, 888

(D.C. 2006) (per curiam) (finding probable cause where suspect in high-drug area who was speaking to another man reached into front crotch area of pants, removed small object, examined object, replaced object in crotch area of pants, walked over to nearby car, returned, again removed small object from crotch area, and handed object to other man). In *Jefferson*, we found "considerable common sense" in the trial court's observation that it could not think of an innocent explanation for "someone exchanging something or giving something from their crotch." *Id. See also id.* (describing police-officer testimony and prior court decisions noting that crotch area was common place to store illegal drugs). When the information available to the police has no plausible innocent explanation, the police have a reasonable basis to conduct an investigatory stop. *See, e.g.*, *United States v. Saucedo*, 226 F.3d 782, 789-90 (6th Cir. 2000) (reasonable articulable suspicion to stop defendant, because "virtually no innocent explanation could have accounted for all of the activities and circumstances witnessed by the investigators"); *State v. Howard*, 803 N.E.2d 450, 461-62 (Neb. 2011) (lack of innocent explanation for defendant's unusual travel plans weighed heavily in favor of finding of reasonable suspicion).

A number of courts have considered whether police had reasonable articulable suspicion to conduct a *Terry* stop based largely or entirely on a

suspect's reaching inside his pants to retrieve or display an object. Those courts have consistently upheld the legality of the *Terry* stops at issue. *See In re Antonio A.*, 2011 WL 4436459, at \*1-2 (Cal. Ct. App. Sept. 26, 2011) (officer had reasonable articulable suspicion to stop suspect, where suspect, who was in gang area late at night, grabbed object in his waistband and pulled it back and forth); *State v. Johnson*, 1996 WL 465419, at \*1-2 (Ohio Ct. App. Aug. 14, 1996) (officer had reasonable articulable suspicion to stop suspect, where suspect, who was standing on street corner in high-drug area, took item from his waistband and put item in back pocket); *cf., e.g.*, *W.H. v. State*, 928 N.E.2d 288, 294-96 (Ind. Ct. App. 2010) (officer had reasonable articulable suspicion to stop suspect, where suspect was lifting up his shirt and showing object inside waistband to another person; "It is quite apparent to an experienced police officer, and indeed it may almost be considered common knowledge, that a handgun is often carried in the waistband.") (internal quotation marks omitted); *Williams v. State*, 717 So. 2d 1109, 1109-10 (Fla. Dist. Ct. App. 1998) (officer in high-drug area had probable cause where suspect, who was "well known as a street person" and had previously been arrested, reached below pants into buttocks area, removed a small object, exchanged object for another small object, looked around, and returned object beneath his pants).

The only case we have located that arguably points in the opposite direction is distinguishable, because although the suspect in that case placed a paper bag inside his pants, there were no other indications of a drug transaction, whereas the present case involves an exchange of small objects out on a street. *See State v. Maryland*, 771 A.2d 1220, 1229-31 (N.J. 2002) (police lacked reasonable articulable suspicion to stop suspect who got off train and placed brown paper bag into waistband of sweatpants, which may or may not have had pockets; court noted absence of testimony as to why officers viewed conduct as suspicious and stated that there was "nothing suggesting that a drug transaction had taken place").

Similarly, in cases in which this court has found gestures involving objects insufficient to support a *Terry* stop, there were plausible, innocent explanations for those gestures. *See, e.g.*, *In re A.S.*, 827 A.2d 46, 46-48 (D.C. 2003) (no basis for *Terry* stop where suspect in high-drug area walked away from police and made stuffing motion in waistband area; court emphasizes that motion "could be the person's tucking in his shirt, scratching his side, pulling up his pants, arranging his underwear, pager, cell phone, or walkman, etc.") (internal quotation marks omitted); *Duhart v. United States*, 589 A.2d 895, 899 (D.C. 1991) (display of "something" to another person without evidence of exchange did not provide reasonable articulable suspicion; "there are innumerable innocent explanations for

such behavior"); *In re T.T.C.*, 583 A.2d 986, 990 (D.C. 1990) (one-way passing of small white object in high-drug area not sufficient basis for reasonable articulable suspicion; "object may have been illegal drugs or any number of other things"). As we have noted, we do not perceive such an innocent explanation in the present case.

## C.

We further conclude that the citizen's description of the suspect provided a sufficient basis to stop Mr. Morgan. The citizen described the suspect as a short black male with dreadlocks who was wearing a shirt described at various points as some combination of blue, gray, and purple, and who was riding a red bicycle in the 1500 block of P Street, NW. When the officers arrived at that location about thirty seconds after the citizen's second call, they saw Mr. Morgan there. Mr. Morgan was riding a red bicycle and, according to the police, matched the description provided by the citizen. Those circumstances supported a reasonable conclusion that Mr. Morgan was the suspect. *See, e.g.*, *United States v. Turner*, 699 A.2d 1125, 1126-30 (D.C. 1997) (officers had adequate basis to stop defendant where suspect was described as black male wearing blue jacket and blue jeans and

as being near 1408 Girard Street, and officers responded to location within one minute and found defendant at stated location matching description).

Mr. Morgan argues, however, that there were two discrepancies between his appearance and the description provided by the citizen: he was wearing a hat when stopped by the police and his shirt was black. Neither alleged discrepancy undermines articulable suspicion. Although Mr. Morgan's wife did testify that Mr. Morgan was wearing a hat when she saw him seated in the police car after the stop, that testimony, even if credited, would not establish that Mr. Morgan had been wearing a hat during the events at issue. And the color of the shirt Mr. Morgan was wearing at the time of the arrest was variously described as "grayish blue or grayish purple" (Sergeant Boteler) and "blue" (Mr. Morgan's wife). In comparison, the testimony indicated that the citizen described the suspect's shirt color as "blue gray," "purplish gray, or purple slash gray," or "purple and grayish." On appeal, Mr. Morgan argues, apparently in reliance upon a police report used for impeachment at trial, that he was actually wearing a black shirt. Given the many other distinctive points of similarity, these varying color descriptions do not undermine articulable suspicion. *See, e.g.*, *United States v. Atkins*, 513 F. App'x 577, 580 (6th Cir. 2013) ("[A] minor difference in reported color (*silver v. 'tannish'*) cannot undermine the validity of a stop supported by other physical

similarities, as well as temporal and physical proximity to the reported crime.”);

*see generally Umanzor v. United States*, 803 A.2d 983, 996 (D.C. 2002) (“the color discrepancy is not dispositive in our assessment of the legality of the *Terry* stop,” because among other things officer could have reasonably inferred that individuals mistakenly believed dark blue vehicle was gray).[1]

The judgment of the Superior Court is therefore

*Affirmed.*

EASTERLY, *Associate Judge*, dissenting:  No sight of drugs.  No sight of money.  All the citizen saw was an exchange of small, unidentified objects that the citizen “*believed*” was a drug transaction.  Do we now suspend the Fourth

---

[1]  Mr. Morgan also argues that the police questioned him in violation of the requirements of *Miranda v. Arizona*, 384 U.S. 438 (1966).  Neither in the trial court nor in this court, however, has Mr. Morgan identified any specific incriminating statement that he believes ought to have been suppressed on *Miranda* grounds.  Mr. Morgan did acknowledge that he possessed K-2, but that statement was not relied upon as part of the basis for conviction during the stipulated trial.  Under the circumstances, we see no reason to address the *Miranda* issue.  *Cf. State v. Ayson*, 129 Wash. App. 1046, at *1-3 (Ct. App. 2005) (unpub. per curiam) (any error in failing to suppress statements was harmless in light of other evidence at stipulated trial).

Amendment's protection against unreasonable searches and seizures and uphold *Terry* stops[1] based on citizens' unsupported beliefs?

No, the majority opinion says; there is one critical fact that establishes the requisite reasonable articulable suspicion[2] to allow the police to lawfully stop Mr. Morgan on the street and investigate whether he was dealing drugs: The citizen told the police that Mr. Morgan "reach[ed] into the back of [his] pants and pull[ed] something out, put it back in." In other words, the majority opinion's sole basis for upholding this stop is a citizen's description of an action one might innocently take to retrieve from one's back pocket one's phone, or wallet, or MetroCard, or work ID, or a business card, or a comb, or a tissue, or a cough drop. The majority opinion concludes, however, that the citizen was not describing anything so innocuous. Instead, the citizen "naturally" must have meant that he saw Mr. Morgan reaching into the waistband of his pants or even his crotch area. I cannot agree.

---

[1] *Terry v. Ohio*, 392 U.S. 1, 19-22 (1968).

[2] *See Peay v. United States*, 597 A.2d 1318, 1319-20 (D.C. 1991) (en banc).

When the government seeks to justify a seizure as a permissible investigative detention under the Fourth Amendment pursuant to *Terry v. Ohio*, it must demonstrate that there were "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Peay*, 597 A.2d at 1319-20 (quoting *Terry*, 392 U.S. at 21); *Upshur v. United States*, 716 A.2d 981, 983 n.3 (D.C. 1998) ("The prosecution has the burden of 'prov[ing] by a preponderance of the evidence that . . . the stop . . . w[as] constitutionally permissible.'" (quoting *Mayes v. United States*, 653 A.2d 856, 861 (D.C. 1995))). The "central inquiry" is whether, "given the totality of the circumstances at the time of the seizure, the police officer could reasonably believe that criminal activity was afoot." *Duhart v. United States*, 589 A.2d 895, 897 (D.C. 1991).

Where, as here, a police officer observes no suspicious activity by a defendant first-hand, and relies instead on a tip from a citizen, the suspected criminal activity must be "describe[d] . . . in sufficient detail." *See Brown v. United States*, 590 A.2d 1008, 1017 (D.C. 1991) (quoting *Rushing v. United States*, 381 A.2d 252, 256-57 (D.C. 1977)). *See also Florida v. J.L.*, 529 U.S. 266, 272 (2000) (requiring that "a tip be reliable in its assertion of illegality"). Thus, it is the police officer's obligation to confirm that what the citizen saw constituted

"*unusual conduct*" which would lead the officer "to reasonably conclude in light of his experience that criminal activity may be afoot." *See Duhart*, 589 A.2d at 899 (quoting *Terry*, 392 U.S. at 30) (emphasis in original). But if the information the police receive from a citizen amounts to nothing more than the citizen's "inchoate and unparticularized suspicion or 'hunch' of criminal activity," *see Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (quoting *Terry*, 392 U.S. at 27), a seizure cannot be validated under *Terry*.

In this case, the government presented only minimal evidence about what the citizen reportedly observed of Mr. Morgan's suspected drug dealing. According to the officer who responded to the citizen's call, the citizen saw Mr. Morgan and another individual exchange unidentified objects, but nothing in the record indicates that the citizen saw any money, and the citizen explicitly told the officer that the citizen did not see any drugs.[3] The citizen did not report any conversation between Mr. Morgan and the other man. The citizen did not report that Mr. Morgan and the other man tried to conceal their actions. The majority implicitly concedes that, even when examined in the light most favorable to the

---

[3] The police officer "asked the citizen . . . if it saw drugs and the citizen was clear, no, [it] didn't see drugs, it just believes it might be drugs based upon the totality of the circumstances it observed."

government, *see Bennett v. United States*, 26 A.3d 745, 751 (D.C. 2011), these facts—which are much like the facts presented in *Duhart*[4]—are "capable of too many innocent explanations," *Duhart*, 589 A.2d at 899, and thus cannot justify the seizure in this case.

The majority opinion upholds the stop based on its determination that the citizen's report of seeing Mr. Morgan "reaching into the back of his pants" is alone a sufficiently suspicious action to justify a *Terry* stop. The majority opinion acknowledges that this general observation could refer to innocuous behavior and

---

[4] In *Duhart* we held that an officer did not have an adequate basis to justify a *Terry* stop where he

> did not even observe a one-way transfer of money or an object appearing to be drugs. Nor was there a particularized fact from which the [officer] could conclude that what transpired had some connection with drugs. Sergeant Tompkins was 25 feet away from appellant when he observed him displaying "something" to another person. He did not see the object, could not tell what it was, never testified that he thought the object looked like drugs or drug packaging, and he observed no transfer of the object or of anything else. The officer simply observed two individuals standing on a sidewalk examining an object; he did not even testify, as the judge found, that the two people were having a conversation.

*Duhart*, 589 A.2d at 899 (citations omitted). We concluded that "[t]here is nothing 'unusual' or even mildly 'suspicious' about such activity, which must occur as a matter of course between individuals every day, and there are innumerable innocent explanations for such behavior." *Id.*

could simply mean that Mr. Morgan was reaching into a back pocket. But the majority opinion dismisses this interpretation as "[un]natural," and then asserts that "the more natural" interpretation is that the citizen meant that he saw Mr. Morgan reaching into the "waistband" or perhaps even the "crotch" area of his pants—or at least that this was the police officer's reasonable understanding of where Mr. Morgan was reaching. With the substitution of "waistband" or "crotch" for "back of the pants," the majority confirms that the police had reasonable articulable suspicion to stop Mr. Morgan.[5]

But is that substitution legitimate? On a purely semantic level, I am not convinced that "back of the pants" is synonymous with "waistband" or "crotch."[6]

---

[5] The majority appears to assume that the reaching into the back of the pants (now waistband or crotch) was part of the exchange of small objects. But there is no indication in the record that whatever Mr. Morgan retrieved from the back of his pants was the source of the "small object" he exchanged. Indeed, the officer's testimony never put the report of the exchange and the report of the man reaching into the back of the pants in temporal order, thus it is unclear which action preceded the other. The officer first testified that the citizen told him about the exchange of unidentified objects. Some time and five pages of transcript later, the officer testified that the citizen reported that "during the course of the suspected drug transaction" the citizen had seen Mr. Morgan "reach into the back of [his] pants and pull something out [and] put it back in."

[6] The majority opinion cites *United States v. Scott*, 987 A.2d 1180 (D.C. 2010), to demonstrate that these terms are commonly used "interchangeably." But the passage it cites indicates that a police officer *actually observed* the defendant

(continued…)

I readily agree that it is noteworthy when an adult in a public place reaches into the waistband or crotch area of his or her pants—which is why I think that, if that were what the citizen had seen, that is what the citizen would have said it saw. The fact that the citizen only generally described Mr. Morgan reaching into the back of his pants makes it seem far more likely that the citizen either did not observe a more

---

(…continued)

reach "into the waistband of his pants and pull out a single ziplock bag containing a white rock substance, which he handed to [a] woman in exchange for cash." *Id.* at 1185 (internal quotation marks omitted). The court in *Scott* later referred more generally to the fact that "[a]n undercover officer saw [the defendant] reach into the back of his pants at the waist to retrieve a ziplock of apparent crack cocaine." *Id.* at 1198. The fact that the court went from a specific to a more general description in discussing this action does not support the assertion that the more general "naturally" and necessarily means the more specific.

Similarly, in *Mothersell v. City of Syracuse*, 289 F.R.D. 389 (N.D.N.Y. 2013), it was clear that the detective who had successfully executed a drug raid of a home actually saw the defendant not just "'fidgeting' with the back of his pants" but also "attempting to stick his fingers inside the waistband of his pants and underwear." *Id.* at 398-99. And a subsequent reference to the defendant's effort "to reach down into the back of his pants," *id.* at 399, in no way supports the majority opinion's determination that every reference to reaching into the back of one's pants necessarily refers to a reach into one's waistband or crotch area.

The majority opinion also cites *Donaldson v. State*, 7 A.3d 84 (Md. 2010), but that case does not support the majority opinion's interchangeability argument, because the officer in *Donaldson* only testified that he saw the defendant reach into the back of his pants. *Id.* at 89. Based on a totality of the circumstances analysis, the court determined that the officer had probable cause to arrest the defendant, but the totality of the circumstances included the officer's observation of the defendant walking into an alley with four other individuals, retrieving a clear plastic bag containing several small, white objects, removing of some of these objects from the bag, and receiving money in exchange for them. *Id.* at 89, 95.

unusual action or was not in a position to observe precisely where Mr. Morgan had reached.[7]

But I also question the majority opinion's analytic approach. This court's obligation to review the facts in the light most favorable to the government does not authorize us to take ambiguously described conduct, sweep aside all benign explanations, and settle on the most nefarious possibility so that we might find reasonable articulable suspicion. Instead, "[a]n inquiry into reasonable suspicion looks for the exact opposite of ambiguity: objective and particularized indicia of criminal activity." *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011); *accord Powell v. United States*, 649 A.2d 1082, 1089 (D.C. 1994) ("Drawing all reasonable inferences in favor of sustaining the trial court's ruling does not, and in fact, can not, require this court to ignore the teachings of *Terry*, which require that a police officer point to 'specific and articulable' facts to establish a reasonable suspicion to justify [a stop and frisk]."). This, of course, was the rationale of

---

[7] The police officer testified that the citizen had described being "pretty close" while observing the exchange of small objects, but the fact that the citizen was unable to identify the objects exchanged suggests that "pretty close" was actually some distance away, and at the suppression hearing the government never asked whether the officer got more specific information about the citizen's distance or vantage point, or whether his view was obstructed.

*Duhart*: We declined to allow actions "capable of too many innocent explanations" to form the basis of reasonable articulable suspicion. *Duhart*, 589 A.2d at 899. Similarly, in *Jackson v. United States*, 56 A.3d 1206 (D.C. 2012), we found a "logical gap" between the actions the police observed and their conclusion that the defendant was dangerous and thus held that "the ambiguous movement in this case cannot be the decisive fact justifying a frisk that was otherwise unwarranted." *Id*. at 1211-12 (citing *Powell*, 649 A.2d at 1091 (Farrell, J., concurring)).[8]

The logical gap in this case cannot be filled by the majority opinion's assertion that, even if "waistband" or "crotch" was not what the citizen meant, "it would be objectively reasonable to understand the citizen's statement" to have this meaning. That my colleagues in the majority are the first to arrive at this understanding undercuts their assessment of its reasonableness. Not only did the

---

[8] This argument is not contrary to or even in tension with *Illinois v. Wardlow*, 528 U.S. 119 (2000), and *Umanzor v. United States*, 803 A.2d 983 (D.C. 2002). The point is not that *any* "ambiguity is fatal to reasonable articulable suspicion" or that *all* "possibility of innocent behavior" must be ruled out before a court can uphold a *Terry* stop. But there is a limit. The "Fourth Amendment requires at least a minimal level of objective justification for making the stop," *Wardlow*, 528 U.S. at 123; *accord Umanzor*, 803 A.2d at 992—which justification is lacking if ambiguous conduct is "capable of too many innocent explanations." *Duhart*, 589 A.2d at 899.

officer never testify that he understood the citizen's statement in that way, the government at trial never argued, and the trial court never found, that the citizen's general statement about Mr. Morgan's actions could reasonably and exclusively be interpreted to describe a suspicious reaching into his waistband or crotch area.

In addition, the majority opinion's willingness to "reasonably" interpret ambiguously described conduct to arrive at reasonable articulable suspicion is improper in that it relieves both the police and the prosecution of the burden of fulfilling well-established obligations.

First, the police should not have unquestioningly credited the citizen's belief that the citizen had witnessed a drug transaction. Nor should the police have initiated a *Terry* stop on the basis of a citizen's vague report of conduct that encompassed myriad innocent actions. Rather, it was the duty of the police to investigate—to seek more particularized information when the citizen gave only general information about the alleged criminal activity (as the investigating officer did, for example, when he confirmed that the citizen had not in fact seen any drugs). *See United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000) ("A hunch may provide the basis for solid police work; it may trigger an investigation

that uncovers facts that establish reasonable suspicion . . . . A hunch, however, is not a substitute for the necessary specific, articulable facts required to justify a Fourth Amendment intrusion."). In *Thomas*, the Ninth Circuit determined that "if a police officer relies on information from another government agency [the FBI] in making an investigatory stop, that information must itself be based on reasonable suspicion. The officer cannot simply defer to the other agency's suspicion without establishing the articulable facts on which that suspicion is based." *Id.* at 1189 (citation omitted); *accord Milline v. United States*, 856 A.2d 616, 619 (D.C. 2004) (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985)) (explaining that "[a]n officer may rely on a police lookout as the basis for such an investigatory stop provided that the lookout itself was based upon a reasonable articulable suspicion that its subject has committed an offense"); *Bryant v. United States*, 599 A.2d 1107, 1112 n.9 (D.C. 1991) ("That the arrest team was entitled to rely on the information transmitted is beyond question. But the scope of justifiable reliance is limited by the objective information imparted." (citation omitted)). By the same token, to conduct a lawful *Terry* stop of Mr. Morgan, the police could not solely rely on a vague description of conduct merely "believed" by a citizen to be criminal, even if that citizen was an employee of the Department of Homeland Security and a reliable source of information.[9]

---

[9] In particular, this court should not excuse the failure of the police to

(continued…)

Second, it was the prosecution's obligation to present evidence at the suppression hearing to demonstrate that the police had reasonable articulable suspicion. The prosecution could have tried to elicit additional evidence that it was reasonable, under the circumstances, for the investigating officer to have understood "back of the pants" as "waistband" or "crotch area"; but the prosecution presented no such evidence. Indeed, it did not focus at all on the officer's testimony about the citizen's vague reference to Mr. Morgan reaching into the back of his pants. Instead it generally argued that, based on the information the officer received from the citizen, the police had enough information to support a reasonable articulable suspicion that Mr. Morgan had engaged in a hand-to-hand drug transaction.

The prosecution made its record. The record it made did not support the conclusion that what the citizen reportedly saw gave the police reasonable

---

(…continued)

investigate and to seek out more precise information where, as here, the citizen's report concerned past criminal activity, and there was no crime or danger to be averted and no need for swift decision-making. *See Hensley*, 469 U.S. at 228 (explaining that the reasonableness analysis is "somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct," because "the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing").

articulable suspicion to believe Mr. Morgan had engaged in a drug transaction. This court should not fill the gaps in the prosecution's evidentiary presentation by putting words in the citizen's mouth and interpreting vague reports of innocuous conduct as suspicious. To the contrary, now more than ever courts must hold firm on reasonable articulable suspicion. "[T]he exclusionary rule is our sole means of ensuring that police refrain from engaging in unwanted harassment or unlawful seizure of anyone—whether he or she is one of the most affluent or most vulnerable members of our community." *United States v. Foster*, 634 F.3d 243, 249 (4th Cir. 2011). The predictable consequence of the majority opinion's holding—that a citizen's vague report of someone reaching into the back of his pants alone can support reasonable articulable suspicion—is more *Terry* stops. Police may happen upon more drug dealers, but surely they will also stop more people who are innocent of any wrongdoing. This court may never see those cases,[10] but we cannot ignore the fact that such stops have significant costs, both

---

[10] "Searches that result in no weapons or contraband being found do not—as a practical matter—make it to the courthouse door." *United States v. McKoy*, 402 F. Supp. 2d 311, 314 (D. Mass. 2004), *aff'd*, 428 F.3d 38 (1st Cir. 2005); *see also Foster*, 634 F.3d at 248-49 ("[T]hese matters generally only come before this Court where a police seizure uncovers some wrongdoing . . . .").

individual and societal—costs which, in my view, further underscore the absence of *reasonable* articulable suspicion in this case.[11]  I respectfully dissent.

---

[11]  "If *Terry* becomes an automatic [stop and] frisk rule in practice, the Fourth Amendment rights of citizens . . . will be eviscerated."  *McKoy*, 402 F. Supp. 2d at 316.